IN THE MATTER OF JOHN W. YENGO, JUDGE OF THE
MUNICIPAL COURT OF THE CITY OF JERSEY CITY,
COUNTY OF HUDSON.

Argued January 11, 1977—Decided March 4, 1977.

Mr. *John DeCicco*, Deputy Attorney General, argued the cause for designated counsel (*Mr. William F. Hyland*, Attorney General of New Jersey, designated counsel; *Mr. DeCicco, Mr. Anthony J. Parrillo* and *Ms. Sally Fields*, Deputy Attorneys General, on the brief).

*Messrs. Bernard S. Glick* and *Louis Saunders* argued the cause for respondent.

The opinion of the court was delivered by

HUGHES, C. J. The Court considers in this case the matter of removal of a Judge of the Municipal Court of Jersey City, John W. Yengo, for cause involving his judicial conduct. Our jurisdictional role in examining that question rests upon a foundation of constitutional and statutory responsibility. *N. J. Const.* (1947), Art. VI, § II, par. 3; *N. J. S. A.* 2A:1B–1 *et seq.*

In fairness to respondent, we note at the outset that no suggestion is made of judicial corruption, personal dishonesty or conflict, or irregularities such as the "fixing" of traffic tickets, tampering with court records or misconduct of that sort. As will be seen, the gravamen of the charge has to do with persistent misbehavior in his judicial performance so bizarre as to amount to "misconduct in office, willful neglect of duty, or other conduct evidencing unfitness for judicial office, or * * * incompetence," designated by *N. J. S. A.* 2A:1B–2, as statutory causes for removal.

## PROCEEDINGS AND JURISDICTION

The 1947 Constitution vested the judicial power of the State in a Supreme Court, a Superior Court, County Courts and "inferior courts of limited jurisdiction," and provided that "[t]he inferior courts and their jurisdiction may from time to time be established, altered or abolished by law." Art. VI, § I, par. 1. The Legislature thereupon authorized the establishment of the Municipal Court, *N. J. S. A.* 2A:8–1

*et seq.,* first designating its presiding officer as "municipal magistrate," 2A:8–5, and later as "judge of the municipal court." 2A:8–5.1. That is the office occupied by respondent, from which he has been temporarily suspended.

The statute which provides for the removal of such a judge, for one or more of the causes mentioned, outlines further procedures as follows:

2A:1B–3.  Institution of removal proceedings

A proceeding for removal may be instituted by either house of the Legislature acting by a majority of all its members, or the Governor, by the filing of a complaint with the clerk of the supreme court, or such proceeding may be instituted by the Supreme Court on its own motion.

2A:1B–4.  Prosecution of removal proceedings

The Attorney General or his representative shall prosecute the proceedings unless the Supreme Court shall specially designate an attorney for that purpose.

2A:1B–5.  Suspension  pending  determination

The Supreme Court may suspend a judge from office, with or without pay, pending the determination of the proceeding; provided, however, that a judge shall receive pay for the period of suspension exceeding 90 days.

2A:1B–6.  Preparation of defense; counsel; production of witnesses and evidence

The judge shall be given a reasonable time to prepare his defense and shall be entitled to be represented by counsel. The prosecuting attorney and the judge shall have the right of compulsory process to compel the attendance of witnesses and the production of evidence at the hearing.

2A:1B–7.  Taking  of  evidence

Evidence may be taken either before the Supreme Court sitting en banc, or before three justices or judges, or a combination thereof, specially designated therefor by the Chief Justice.

2A:1B–8.  Rules governing

Except as otherwise provided in this act, proceedings shall be governed by rules of the Supreme Court.

2A:1B–9.  Removal

If the Supreme Court finds beyond a reasonable doubt that there is cause for removal, it shall remove the judge from office. A judge so removed shall not thereafter hold judicial office.

The proceedings are further governed, as provided in *N. J. S. A.* 2A:1B–8, by Rules of Court, *R.* 2:14–1 *et seq.,* as amplified and largely superseded by *R.* 2:15 *et seq.,* adopted

in July 1974, describing detailed mechanisms for judicial removal, as well as alternatives, and preliminary proceedings with respect thereto. *See* Pressler, Current New Jersey Court Rules, Comment *R.* 2:14.

*R.* 2:15–1 *et seq.* created the Supreme Court's Advisory Committee on Judicial Conduct. That Committee received and processed complaints against respondent. Its Presentment and Recommendation for Institution of Formal Removal Proceedings, read in part as follows:

> This matter was brought to the attention of the Advisory Committee on Judicial Conduct when several transcripts of trials before the respondent John W. Yengo who was appointed Judge of the Municipal Court of Jersey City on July 11, 1974, were referred to the Committee. After a preliminary investigation was conducted, a verified seventeen count complaint and supplemental complaint were filed with the Committee and served on the respondent. Following the receipt of respondent's answer to the complaint, the matter was set down for hearing before the Committee on June 23, July 8, and September 12, 1975 and at the hearings numerous witnesses testified, transcripts of testimony of the cases being studied, and other pertinent documents were marked in evidence. Respondent cross-examined the witnesses, produced witnesses in his defense, and testified extensively in his own behalf. At the conclusion of the hearings, the Committee reserved decision, and after a full study of the matter, concluded that the evidence showed beyond a reasonable doubt that (a) Judge Yengo is by temperament unsuited for judicial office, (b) he is unable to perform the duties of his office impartially, dispassionately and with the dignity required of a judge of a municipal court, (c) he is unable to understand or unwilling to accept and apply the basic doctrine in criminal and quasi-criminal cases that the State has the burden of proving the charge against the defendant beyond a reasonable doubt, and that the accused on being charged does not have an initial function of establishing his innocence. For these reasons, the Committee feels strongly that the public interest in the administration of justice can be served only by the removal of Judge Yengo from the Municipal Court of Jersey City.

This Court issued an order to show cause which led to the voluntary suspension of respondent from his judicial office pending the outcome of the proceedings. Following a hearing, respondent's motion to dismiss was denied. On the basis of the Presentment of the Committee the Court ordered the

issuance of a complaint instituting formal removal proceedings. Three judges of the Superior Court were appointed to take evidence, in accordance with *N. J. S. A.* 2A:1B–7.

Thereafter that "statutory court" conducted hearings encompassing many days, fully participated in by respondent and counsel representing him. Testimony was taken of witnesses including respondent and those called by him. Court records and transcripts of cases heard before respondent were admitted and scrutinized, and the statutory court listened to many tapes of actual proceedings in his courtroom. It determined and reported facts and conclusions related to his fitness to continue in judicial office, and filed with this Court transcripts of the voluminous testimony, and exhibits admitted before it.

This Court thereupon reached independent conclusions of its own on the evidence so taken, as will be mentioned hereafter, on the focal question assigned to it by statute: "If the Supreme Court finds beyond a reasonable doubt that there is cause for removal, it shall remove the judge from office." *N. J. S. A.* 2A:1B–9. We observe that throughout all these extensive hearings and proceedings, including respondent's appearances with counsel in answer to several show cause orders and the Court's consideration and denial of several motions, careful attention has been paid, as should be, to the full due process rights of respondent.

## THE NEW JERSEY MUNICIPAL COURT SYSTEM[1]

A look at the history of the local administration of justice before and after the 1947 Constitution is important in order

---

[1] *N. J. S. A.* 2A:8–1 provides for the establishment of single muicipal courts by ordinance. The judge of a municipal court of a single municipality is appointed by the local governing body pursuant to *N. J. S. A.* 2A:8–5. Various urban communities, including Jersey City, have more than one municipal court judge, likewise appointed locally. The statute (*N. J. S. A.* 2A:8–1 and –3) also provides for the establishment of inter-municipal courts by two or more municipalities by appropriate ordinances. This step is gen-

to assess respondent's judicial performance in the context of constitutional, legislative and public expectations of the judicial conduct required of the present-day municipal judge.

The earlier period of the administration of criminal justice at the local level was described by then Chief Justice Vanderbilt at an Annual Conference of Municipal Magistrates and Attorneys, reprinted at 10 *Rutgers L. Rev.* 647–48 (1956):

Under our revolutionary Constitution of 1776 the justices of the peace, along with the judges of the other courts, were elected by the Legislature for a term of years. Their position in the community was roughly comparable to that of the English justices of the peace of the same period * * * who [were] generally the leading citizens of the county with a tradition of public service. One of the ways in which our second Constitution, that of 1844, reflected the democratic revolt of the Jacksonian era was in providing for the popular election of justices of the peace by townships and in the cities by wards. Such elections, here and elsewhere throughout the country generally, reflected the popular demand of the period for the direct election of judges who would be "close to the people," and no thought was given to imposing any standards or qualifications for the office. Thus the New Jersey Constitution of 1844 put the justice of the peace in local politics with the undesirable results that inevitably flow from mixing judicial work and politics. The election of a justice of the peace as a prank of his neighbors was not unknown, and the office shrank in dignity and usefulness.[2]

---

erally decided upon in smaller or rural communities. The judge of such a joint municipal court is appointed by the Governor with the advice and consent of the Senate. *N. J. S. A.* 2A:8–5.

As of the most recent court year statistics, there were functioning 382 municipal court judges in the 567 municipalities of New Jersey. Many judges are appointed to preside in more than one municipal court, particularly in smaller communities. In the court year ending August 31, 1976, the municipal courts in New Jersey processed 3,826,998 complaints.

2The justice of the peace was sometimes mentioned in humorous verse:

I'm important in the County
I'm a Justice of the Peace,
And I disbelieve Defendants
When they contradict the P'lice.
[Nordberg, Farewell to Illinois J. P.'s,
Chicago Bar Record, Volume XLIV (No. 10),
September 1963, p. 469].

He recalled that in the cities the police judges had taken
over the bulk of the criminal jurisdiction of the justices of
the peace under a mass of statutes varying in application
from municipality to municipality. Thus there was created
a jurisdictional chaos. The low estate of the police courts,
the "justly maligned" justices of the peace, as well as the
confusing, inefficient and frequently condemned system by
which the compensation of those judges depended in part on
the penalties they assessed against defendants they found
guilty of some offense (a practice that had been responsible
for bringing many a local court into disrepute), were con-
ditions noted with disapproval by Chief Justice Vanderbilt
as well as the public at large.

He then contrasted developments after the new Constitu-
tion was adopted:

[I]t was no wonder that there was no storm of protest over the
exclusion of the justice of the peace from the 1947 Constitution,
but instead general acquiescence in the resolution of the delegates
to the Constitutional Convention memorializing the Legislature
> to take such action as may be deemed necessary to establish a
> modern and efficient inferior court system to be presided over by
> qualified persons and to provide that all judges of the inferior
> courts receive reasonable fixed compensation which shall have no
> relation to fees received.

The Legislature acted promptly in response to this mandate by en-
acting [a law] which abolished not only the justices of the peace,
but also "the existing police, magistrate, or recorder's courts, by what-
ever name called" and provided for the establishment of our present
system of municipal courts. [10 *Rutgers L. Rev.* at 648–49].

In light of this reform in the municipal court system,
Chief Justice Vanderbilt stressed the importance of these
courts, expressing a caveat to the constitutional characteri-
zation of them as "inferior" courts (actually a term of art,
not implying any disrespect). He believed that the local
courts of first instance are the very foundation of the en-
forcement of the criminal law; that upon them rests primary
responsibility for the maintenance of peace in the various

communities of the State, for safety on our streets and highways, and most important of all, for the development of respect for law on the part of our citizenry, upon which in the last analysis all of our democratic institutions depend. He said "[t]his is the underlying reason why I have repeatedly called the municipal courts the most important in our state." *Id.* at 650. He rejoiced at their post-Constitution accomplishments which had brought about legislative enlargement of their jurisdictional power,[3] and he said "[t]he manner in which the municipal courts over a period of seven years have exercised their growing powers makes a proud record." *Id.* at 653. He emphasized outward symbolism as a spur to judicial probity and impartiality and consequent public confidence in the courts:

> The wearing of a judicial robe by a judge is important in part because it reminds all concerned of the fact that the judge represents the law on which liberty depends, but — and this is even more important — the robe is even more significant as a constant reminder to the judge that he does not have the freedom of the ordinary individual but is himself bound to submerge his personal feelings in the impartial administration of the law. The judicial robe is a constant reminder to the magistrates that they, like all other judges, are subject to the Canons of Judicial Ethics as rules of court. * * * It is not enough that a judge be honest and impartial; it is essential that he have the reputation in his community for being a man of absolute integrity, whose judgment is not and cannot be influenced by other than the proofs introduced before him in court. [*Id.* at 653].

Later, Chief Justice Weintraub expressed a similar view as to the importance of the local courts:

> [I]n terms of human experiences our magistrates preside in the most important courts in the state. To appreciate that this is so, we need but look at the nature and number of the matters they handle. * * * * * * * *

---

[3]"The municipal court as an institution has made remarkable strides in the last seven years in earning the respect of the people in this State and as a result it has been entrusted with greatly enlarged jurisdiction * * *." *In re Klaisz*, 19 *N. J.* 145, 148 (1955) (Vanderbilt, C. J.).

* * * [A] very substantial percentage of our citizens are directly involved with our municipal courts, to say nothing of the thousands who appear as witnesses or spectators. For most of them, it is their only contact with the judicial process. The impressions they receive serve to shape their opinion of the judicial system, our laws and law enforcement. We cannot permit that opinion to be anything but one of confidence and respect. [81 *N. J. L. J.* 597 (1958)].

Chief Justice Weintraub would often repeat this theme. In greeting Municipal Judges at the Eleventh Annual Conference of Magistrates in 1959, he reminded them that they "represent[ed] by far the most productive, the most active part of the judicial system, and * * * in terms of citizen exposure, the most important one"; that "all of us" must have "active concern" with the standing and reputation of the municipal court; that "anything that happens in just a few of the courtrooms casts a shadow upon all of us."

In *In re Mattera,* 34 *N. J.* 259, 275 (1961), he stressed:

In many respects the municipal court is the most important in our judicial system. No other court can match its volume of causes. Our municipal courts dispose annually of approximately one and one-half million matters, a number which dwarfs the total proceedings in all other courts of the State. For all practical purposes, the judgments of the municipal court are final. It is there that most citizens have their sole exposure to the judicial process. The respect they have for the judiciary hinges upon that experience. Thus the magistrate has a unique responsibility for the popular image of the entire system.

In another context, but equally relevant, this Court noted in *In re Spitalnick,* 63 *N. J.* 429, 431–32 (1973), that:

This Court cannot allow the integrity of the judicial process to be compromised in any way * * *. A community without certainty in the true administration of justice is a community without justice.

Nowhere can the community be more sensitive to the regularities — and irregularities — of judicial administration than at the local level.

The same view was expressed during the unfortunately brief tenure of the late Chief Justice Garven. During his last illness his speech to the Judicial Conference of Municipal

Court Judges was read for him by Justice Mark Sullivan, and he reminded those judges that:

> You, judges of the municipal courts of this State, represent the first bastion of our judicial system. Thousands of our citizens are exposed to justice in New Jersey through the municipal courts. They are unaware of the activities of any other court. To these people, you *are* the judicial system. This alone places a heavy burden upon you. [96 *N. J. L. J.* 1237 (1973) (emphasis added)].

The members of the present Court are equally convinced that the municipal courts, from the standpoint of contact, observation and acceptance by the public, are in a preeminent position for the sustaining of universal respect for the administration of justice. That is why we have persisted, through the Administrative Office of the Courts, in training and orientation, not only of judges but other municipal court personnel. Our rules deal extensively with municipal court practice. *R.* 7:1 *et seq.* Seminars are conducted at frequent intervals. A municipal court bulletin issues monthly, discussing recent decisions and procedural reforms. Regular audits of municipal court accounts are filed with and examined by the Administrative Office of the Courts, which office maintains a special municipal court section. Local trial court administrators conduct periodic visitations of municipal courts at the direction of the respective Assignment Judges, who are responsible administratively for the proper functioning of the municipal courts.

For the proper administration of justice and public confidence therein, this Court created the Advisory Committee on Judicial Conduct, pointing out our adoption of the Code of Judicial Conduct (Appendix to Part 1, Rules Governing the Courts of the State of New Jersey). We expressed the view that:

> While many fundamental guides to the conduct of judges are included, the observance of two provisions would enhance mightily, [we] think, public trust and confidence in our system:

Canon 3(A)(3) provides:

"A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom he deals in his official capacity, and should require similar conduct of lawyers and of his staff, court officials and others subject to his direction and control."

Canon 3(A)(4) provides:

"A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law * * *"

In a free society, the court's influence, acceptance and power alike rest, not only on Constitution and statutory law but upon public confidence in its probity, objectivity and freedom from outside pressure of whatever kind. This applies to all courts, including the hundreds of Municipal Judges who, as Chief Justice Vanderbilt used to say, were those nearest to the people.

It is to guard this reputation and to strengthen this public confidence, not only in the courts but in our profession in general, that the Supreme Court is establishing its Advisory Committee on Judicial Conduct. This Committee will investigate and consider complaints as to judicial misconduct of whatever kind and report its findings to the Supreme Court for appropriate remedial action. [97 *N. J. L. J.* 278 (1974)].

It is therefore apparent, despite the many societal changes which have occurred in recent years, that the policy of the Supreme Court continues unaltered in its insistence that all courts within its constitutional and administrative direction shall so comport themselves as to dignify the administration of justice and deserve the confidence and respect of the public.

Such is the purpose of the rule of court (*R.* 1:18, originally *R.* 8:13–5(a) (1948)), which subjects all judges, including municipal court judges, to the strictures of the Code of Judicial Conduct: "It shall be the duty of every judge to abide by and to enforce the provisions of * * * the Canons of Judicial Ethics," (now known as the Code of Judicial Conduct). *See* Pressler, Current New Jersey Court Rules, Comment *R.* 1:18.

We therefore pass to a brief review of that Code of Judicial Conduct against which to measure respondent's behavior in office.

## THE CODE OF JUDICIAL CONDUCT

The Code contains the following significant provisions:

(1) An independent and honorable judiciary is indispensable to justice in our society. A judge should * *ᵗ * observe high standards of conduct so that the integrity and independents of the judiciary may be preserved.

(2) A. A judge should respect and comply with the law and should conduct himself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.

### Commentary

Public confidence in the judiciary is eroded by irresponsible or improper conduct by judges. A judge must avoid all impropriety and appearance of impropriety. He must expect to be the subject of constant public scrutiny. He must therefore accept restrictions on his conduct that might be viewed as burdensome by the ordinary citizen and should do so freely and willingly.

(3) A. (3) A judge should be patient, dignified, and courteous to litigants, jurors, witnesses, lawyers and others with whom he deals in his official capacity * *ᵗ *.

### Commentary

The duty to hear all proceedings fairly and with patience is not inconsistent with the duty to dispose promptly of the business of the court. Courts can be efficient and business-like while being patient and deliberate.

(3) A. (4) A judge should accord to every person who is legally interested in a proceeding, or his lawyer, full right to be heard according to law, and, except as authorized by law, neither initiate nor consider *ex parte* or other communications concerning a pending or impending proceeding.

(3) B. (1) A judge should * * * maintain professional competence in judicial administration * *ᵗ *.

(3) C. (1) A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including but not limited to instances where:

    (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

The Code of Judicial Conduct would effectuate the aphorism of Sir Francis Bacon — "The place of justice is an hallowed place." We turn to the examination of events in respondent's courtroom in the context of that ideal.

## THE FACTUAL BASIS FOR REMOVAL

While it would be unduly cumbersome in this opinion to examine all of the proceedings described in the evidence taken by the statutory court, it is useful to mention a few which we have determined represent a pattern of respondent's conduct as a judge.

One of the counts involved a disorderly persons complaint against a Mary Ann Cronin, unrepresented by counsel and, as appears by the record, an inebriate, probably sick, disrespectful in her attitude, but standing defenseless before the court. There were also other unanswered "disorderly persons" complaints, on which another judge had issued warrants for failure to appear, Judge Yengo considering such failures as "contempts." The court greeted the defendant with a preconception:

| The Court: | This looks like one of those habituals. |
| *     * | *    *    *    *    *    * |
| | You ought to be ashamed of yourself. |
| Mrs. Cronin: | Well it's my family's fault too. |
| The Court: | Yes, your family's fault. |
| Mrs. Cronin: | Yes, and my husband. |
| The Court: | Your mother was in bed when the child was conceived. Huh? |
| Mrs. Cronin: | How come my husband gets away with it? * * * |
| The Court: | Shut up. * * * |

This coarse exchange was followed by threats by the court, concerning the "contempt" charges:

| The Court: | * * * You don't [need] a lawyer and you don't get any adjournments. I'm going to do something about you today and you're not going to be so smart. |
| *     * | *    *    *    *    *    * |
| | Okay. On the contempt citations, there are three against you. You failed to appear in the Municipal Court on hearings. |
| Mrs. Cronin: | I was sick. |
| The Court: | *    *    *    * |
| | Do you have anything to say for yourself? |
| Mrs. Cronin: | Yes, your Honor. |

| The Court: | Say it. All of a sudden it's not so funny. Is it? Well I'm listening. Tell me some good things about yourself. |
|---|---|
| Mrs. Cronin: | Well you know how it goes. |
| The Court: | No, I don't. I'm going to tell you how you're going to go. You're going to the Hudson County Penitentiary or wherever they place people like you for a period of 90 days. |

After Mrs. Cronin made an impertinent remark to her mother (the complaining witness), the court reacted:

| The Court: | I'm going to reconsider the sentence. I'm adding 30 more days. That is 120 days. All right? She is not to be released under any circumstances unless I am apprised of any possible request. |
|---|---|
| Mrs. Cronin: | I want to go to a mental hospital. I want to go to a mental hospital. |
| The Court: | Get her out of here * * *. |

We have not attempted to repeat the whole interchange in this "hearing," but our scrutiny fully supports the statutory court finding that:

At no time was defendant advised that she had a right to an attorney nor was she advised she might be sentenced to six months in jail on each of the [contempt] complaints. No witnesses were sworn; no testimony was taken. The proceedings were highly irregular.

The statutory court saw some mitigation in the court's possible concern with a dependent child of defendant, her impertinent and defiant attitude and the crowded calendar of the courtroom. We see no such mitigation, as though the antagonists in this disgraceful colloquy were equal. She was disadvantaged and defenseless as she stood in an American courtroom; whereas he was a *judge* and his conduct must be evaluated as such.

In this count respondent was charged with the following: (1) failing to advise the defendant of her constitutional rights; (2) failing to advise Mrs. Cronin of her right to an attorney; (3) failing to swear witnesses or take testimony,

and summarily sentencing Mrs. Cronin to 120 days in the Hudson County Penitentiary; (4) comments and conduct that "were harsh, arbitrary and contrary to law"; and (5) an attitude that was "undignified, discourteous and partial to the interests of the State."

We find that these charges have been proven beyond a reasonable doubt.

In another case, one Timmons was charged by his mother with annoying and harassing her. The court attendant called him before the bar but he did not answer, although he appeared soon thereafter and entered a plea of "not guilty." In his absence the judge had said "he probably took it on the lam" and proceeded to interrogate the defendant's mother about defendant's conduct:

Sponging and freeloading on his mother. He gives you a lot of trouble too, I'll bet. Huh?

\* \* \* \* \* \* \* \*

You need that like — if I can get my hands on him we'll see if he's guilty or innocent.

The factual basis for the complaint by defendant's mother consisted of hearsay, — what another child had told her about defendant's visit to her home. Aside from her testimony to that effect and the explanation of defendant, the "trial" consisted of this:

The Court:    Well all right. Is that all you have to say?
Mr. Timmons:  Yes.
The Court:    Were you told to stay away from there when you appeared in Court the last time?
              I find you guilty. Now we have to decide what we're going to do with you.
              You know, I've listened to a lot of malarkey in my day. I've been around a long time. I've listened to a lot of bull sessions, I've listened to a lot of fellows that think they can con a fellow. You can't con a man like me because I started right from the bottom, right from the bottom. You know, in my day we used to go to the dumps to scheme to make a nickel or a dime. I did all that so you're not conning me. You have a decent mother but she has a rotten

|               |                                                                                                                                                                                                                                                                                                                                                                                |
| ------------- | ------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------ |
|               | son. You will stay away from your mother. She doesn't want you there.                                                                                                                                                                                                                                                                                                           |
|               | Now you didn't listen the last time. This time I'm going to give you something to go by and you are going to listen. I sentence you to 15 days in the Hudson County Pen. That's it. The next time if your mother files a complaint and you come back here will be a lot longer. I was going to make it 30 and suspend but I'm going to be straight with you. 15 days.             |
| Mr. Timmons:  | May I say something now that you've already sentenced me?                                                                                                                                                                                                                                                                                                                       |
| The Court:    | You can say all you want while I'm writing but don't insult me because I'm telling you now —                                                                                                                                                                                                                                                                                    |
| Mr. Timmons:  | Well in the first place well like you stand here telling me that I'm trying to con you. I don't understand how you feel that I'm trying to con you —                                                                                                                                                                                                                             |
| The Court:    | I don't believe that bull about you and your brother looking for somebody — stay away from your mother's home. That's how you're conning me. You were told before.                                                                                                                                                                                                               |
| Mr. Timmons:  | Had I knew that I needed witnesses to prove this I would have had them here in Court this morning. I can verify what I was saying.                                                                                                                                                                                                                                               |
| The Court:    | 15 days in the Hudson County Pen. I believe your mother.                                                                                                                                                                                                                                                                                                                        |

The statutory court made the following findings: (1) the respondent improperly discussed the case with the complainant while the defendant was not present and developed a bias against the defendant contrary to law; (2) hearsay evidence was improperly allowed; (3) respondent's remarks "were made in a loud, angry voice"; (4) respondent's remarks were "imprudent, injudicious and not in keeping with the desired conduct of a judge"; (5) respondent failed to advise the defendant of his right to counsel and his right not to testify; (6) respondent engaged in the improper practice of making general announcements of the right to counsel and the right not to testify at the opening of court; and (7) respondent's "actions were improper, contrary to law and not befitting a judge." We agree.

Another matter involved a defendant named Lott, who had been released on his own recognizance by another mu-

nicipal judge and who duly appeared before Judge Yengo to answer the charge. The State requested a postponement because of the non-appearance of the complaining witness. Respondent seized the opportunity to revoke the existing order and hold defendant in bail. The public defender pointed out:

A fellow Municipal Court Judge set the bail in reference to Mr. Lott. Your Honor, he comes to Court. He's appeared. He's never failed to appear, and the complainant doesn't appear and now when [defendant] appears his bail is being upped. It doesn't strike me as justice in this particular case.

The Court subsequently stated:

I'm running this Court, not the public defender. * * * Remove this man. Incarcerate him until he posts the bail.

The statutory court found from the evidence before it, *inter alia,* "that respondent's actions in setting bail under the circumstances before him were arbitrary, an abuse of discretion and not supported by a credible factual basis. His conduct in this respect was injudicious."

We agree, but are not surprised because the record shows that respondent considered bail as an arbitrary weapon for harassment of defendants. For instance, a case involving an Alice Martin arose from a drunken and disorderly street fracas with one Henderson, quelled by arresting policemen. She stood before the court charged with simple assault and battery. She was hurriedly persuaded to a trial without an attorney, although respondent took care to have the record denote a waiver. She admitted she was fighting and apologized to the Court. The Judge stated:

Alice Martin, I have no sympathy for you whatsoever. You disgust me, and the decent living people of Jersey City, and we are not going to tolerate your nonsense any longer. If I'm around to see to it. You are hereby sentenced to the Hudson County Penitentiary for a period of 30 days on this complaint. * * *

After sentencing, Mrs. Martin's brother-in-law sought leniency for her, because he was financially unable to care for her small children. Respondent was adamant. A public defender, Mr. Gold, appeared then and indicated to the Court:

She has no prior criminal record. She is the mother of two children, ages 6 and 8. She lives in Jersey City and has done so for the last 17 years. She has two part time jobs by which she supports herself and her family. She works for the Merit Wholesale Shirt Company and she works in a bar part time. She had meager earnings of $75 or $80 a week and your Honor has sentenced her to a 30 day custodial sentence. I would ask for reconsider, reconsideration of sentence. I'm asking this in her behalf and I would ask for a noncustodial sentence in light of the facts I have just presented to the Court.

Respondent's rejoinder discloses the motivation for his peculiar judicial philosophy, — the seeking of public approbation. He exhibited his prejudice by addressing the public defender as follows:

The facts presented to the Court don't impress the Court. * * * I feel that this woman is a menace to society. I feel she's a disgrace. I feel she has harmed not only the police, the public at large and yours truly. I have no compassion for people who start trouble. She's separated from her husband. She knows Henderson is married and she engaged in folly, and you can include a lot of other stuff with folly. He was up at her apartment a short while before. It seemed like it was a pleasant relationship until something went wrong. I am not impressed with this type of person. I'm sorry. The sooner the Court — the press has taken pot shots at the Court. The press never said: This does not apply to John W. Yengo, it only applies to this Judge and that Judge. But when the person reads it they say: "Oh, Yengo's a Judge in that Court. He's one of the culprits who won't bear down on the defendants." Somehow or other the people are getting the message and know that Yengo is not taking it sitting back. And I'm going to continue, continue until the defendants know it, until these guilty people know it, until the poor victim is protected.

* * * * * * * *

* * * But the public defender, the knight in shining armor comes here and he says: Please, be lenient. To that I say no. She'll serve 30 days in the Hudson County Jail. If you want to appeal, go up

there. If they have no room for her there, as far as I'm concerned they can pitch tents.

The proceedings continued:

Mr. Gold: * * * Now that I'm going to appeal this matter I would like to ask —

The Court: You still don't impress me.

Mr. Gold: I'd like to ask the Court for bail pending appeal. Or bail after conviction and pending appeal * * *. And I would ask the Court for a reasonable bail, * * * so an appeal can be presented.

The Court: I will not stay the sentence pending appeal. * * *

Mr. Gold: I'm not asking for a stay of the sentence. I'm asking for bail pending appeal.

Mr. Fox: [The municipal prosecutor] Your Honor, the State has no objections to bail being set in this matter.

The Court: I will set bail. * * * Bail in this case will be $3,000. * * *

Mr. Gold: Your Honor, this is a disorderly persons offense at this point.

Mr. Fox: Your Honor, may the State be heard with counsel?
* * * * * * * * * * Your Honor, I believe a more reasonable bail should be set in view of the attendant circumstances. The State would recommend a $100 cash bail.

The Court: No good. Absolutely not. I'll reduce the bail to $2,500. Keep pounding the hammer. Maybe I'll come down to $2,000. Do you want to try again?

Mr. Fox: Your Honor.

The Court: $2,000 and that's it. The auction is over. I don't want to hear anything else.

The statutory court reports that "[i]t should also be kept in mind that the Prosecutor joined in Mr. Gold's request for 'more reasonable bail' but that respondent in refusing such request conducted a mock auction accompanied by the banging of a gavel in the style of an auctioneer." It is not surprising that the panel found, as do we, that the remarks and conduct of respondent were harsh and arbitrary and that his attitude was undignified and discourteous to counsel.

Respondent seemed to relish his judicial power to imprison others than defendants on occasion. In *State v. Perry,* he refused to permit a complaining witness to explain confusion

about the date of an incident involved in a complaint filed by him.

The Court: Come back here. I'm holding you in contempt for perjury. What have you got to say? You committed it in the presence of this Court.

Mr. Grant: As far as I know it happened on May 24th.

\*      \*      \*      \*      \*      \*      \*      \*

The Court: You gave them the 10th of July, '74 in court. You signed an affidavit that it happened on July 10, 1974. I hereby find you guilty and sentence you to 10 days in the Hudson County Penitentiary. Bailiff — Hudson County Penitentiary.

The statutory court concluded, and we agree, that:

It is clear that the witness was held in contempt because respondent was of the opinion that he made inconsistent statements under oath.

If there was deliberate false swearing or perjury, respondent should have referred the matter to the Prosecutor rather than hold the witness in contempt. Furthermore, there is strong indication that if there were inconsistent statements, they stemmed from confusion rather than a deliberate attempt to falsify. Finally, there is also strong indication that there may very well have been separate incidents \* \* \* and that Mr. Grant did not in fact make any inconsistent allegations. The tape which the panel heard in open court reveals that Mr. Grant was completely respectful and was merely trying to clear up the confusion as to dates. He should not have been held in contempt of Court.

The conduct of respondent in this matter was intemperate, harsh, arbitrary and contrary to fundamental law.

Respondent considered himself part of the prosecution structure rather than an impartial judge. On a complaint in *State v. Whitehead,* this exchange occurred:

Prosecutor: The state wishes to move contemplating dismissal. I know the court is familiar with the case.

The Court: Well we can make it stick if the police officer wants to go ahead, but all right you make a motion to dismiss.

A 21 year old named Shinholster was accused of an offense involving no violence, which charge had been down-

graded to a disorderly persons accusation. Having no previous criminal record, he had been free on $500 bail. A quick conviction before respondent resulted in a 90 days sentence to the Hudson County Penitentiary. The public defender addressed the Court:

Mr. Gold: Judge, I'm going to file an appeal in this case.

The Court: I won't stay the sentence. Let him smell the jail. It might help him.

Mr. Gold: I would just like to ask the Court if it's seen the directive admitting a defendant to bail at the same bail that was given to him prior to the trial and —

The Court: I saw the directive. I'm sending him to jail. You can make your appeal —

Mr. Gold: The Court will not honor that?

The Court: Nope. I will not.

The directive referred to is embodied in *N. J. S. A.* 2A:162-11, which provides:

In every case where a person has been convicted in a municipal court of a disorderly persons violation, and he has not violated or forfeited his bail * * * such bail * * * shall continue in the same terms and effect pending appeal to a County Court in lieu of posting a new bond in connection with the appeal * * *.

The respondent's disrespect for law extended to the Constitution and cases decided under it by the United States Supreme Court, representing the supreme law of the land. The following colloquy took place in *State v. Jiminez,* a trial on charges downgraded to disorderly conduct. A question had been asked by counsel as to whether an arresting police officer had informed the defendant of his rights under *Miranda v. Arizona,* 384 *U. S.* 436, 86 *S. Ct.* 1602, 16 *L. Ed.* 2d 694 (1966). This ensued:

The Court: Was he given his rights?

Mr. Campbell: Yes, your Honor.

The Court: Well when do you give the rights? When are you supposed to are these alleged — are we talking about the last Rights or —

Mr. Campbell: No, I was saying —
The Court: The Miranda bit and all that? Is that what you're saying?

\*    \*    \*    \*    \*    \*    \*    \*

Now when they arrest they give them their rights. Isn't that right? If they want rights, that's when they get the last rights.

This heavy-handed humor with respect to the last rites, a religious ceremony associated with the onset of death, was inexcusable. And sneering at and deriding the supreme law of the land will not be tolerated in a New Jersey courtroom.

The statutory court determined that respondent improperly found the defendant guilty of an indictable offense which was not before him and over which he had no jurisdiction. It attributed this error to confusion, but it is clear that his actions in this regard demonstrate an inability to follow established law. We have determined upon our view of the evidence that aside from the other misconduct in this case, the respondent abused his discretion in his refusal to stay sentence pending appeal. His conduct in whole demonstrated judicial incompetence.

In *State v. Albigese,* the actions of respondent were particularly discordant with the judicial process. A defendant, charged with violations of the Municipal Housing Code for some electrical deficiencies, received notice on July 31, 1974, that his case would be heard on August 2, 1974. On August 1 his attorney, then out of the state, telephoned respondent seeking postponement, which was refused. On the hearing date defendant appeared and asked postponement because of the unavailability of his counsel. Respondent refused, telling defendant to have a lawyer in the courtroom to defend him within 20 to 30 minutes. At that hearing, respondent found defendant guilty and fined him $400. At a second hearing on August 9, 1974, after holding defendant's counsel in contempt of court, the Judge found defendant guilty of 136 violations and fined him $100 per violation or $13,600. During the first hearing the Judge exhibited gross disrespect

for counsel, who pleaded he had not been able to prepare in the 20 to 30 minutes allotted as above:

Counselor, you know I'm getting a little tired of you. I let you sit down because you told me you were tired, perhaps a little ill. You're trying to make a mockery of this court. You're not going to do it. I made myself clear, and no one in this town has a louder voice than John W. Yengo. I don't even need this microphone. * * *

As the court began to announce its decision, the attorney, Mr. Silverstein, rose to his feet:

The Court: Do you want to go to the mens room?
Mr. Silverstein: I want to sum up, Your Honor is making a decision before hearing us.

When Mr. Silverstein had appeared after the abrupt "20 to 30 minute" demand, he had apparently told the court that his client had advised him that he believed the Judge would jail him unless he could defend with counsel after 20 to 30 minutes. The Judge held Albigese in contempt for this out-of-court statement.

█ In the interval between the two hearings, the Judge took the trouble to inspect the involved premises personally, later refusing to disqualify himself, a questionable practice at least without consent of parties and counsel. *Cf. James v. State,* 56 *N. J. Super.* 213 (App. Div. 1959); *State v. Muraski,* 6 *N. J. Super.* 36 (App. Div. 1949); Code of Judicial Conduct, Canon 3C(1)(a) ("A judge should disqualify himself in a proceeding in which his impartiality might reasonably be questioned, including * * * instances where: (a) he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding").

When substituted counsel suggested such disqualification and made other observations, the court held him in contempt and bullied him into a forced apology, to avoid punishment by the court. A sample:

| | |
|---|---|
| Mr. Mullica: | I have the duty — I have a duty as an attorney representing a client and — |
| The Court: | All right, Mr. Mullica. You are an attorney? Then listen to me now. Shut up. |

\*    \*    \*    \*    \*    \*    \*    \*

| | |
|---|---|
| Mr. Mullica: | But I have further reasons for objections. |
| The Court: | You are held in contempt. For disrupting this Court you are held in contempt. |

The statutory court concluded, and we agree:

> In none of the holdings of contempt of court or threats of such holdings in this matter was the action or conduct of respondent justified. Defendant did not do or say anything contemptuous. However, even if he did, it is clear that such contempt would in no way constitute a contempt in the presence of the Court such as to justify the way the respondent summarily dealt with the matter. The conduct of the respondent was arbitrary and contrary to established law and procedure.
>
> In view of the lack of adequate notice to defendant respondent's insistence of going forward with the hearing on August 2 was inexcusable. The conduct of the two hearings evidenced a bias against defendant apparently acquired by respondent's personal examination of the area. The conduct at the hearings evidenced unfitness for judicial office.

We note a final aberration. Not only was respondent contemptuous of Constitution and law, but markedly disrespectful of higher judicial authority.

On March 31, 1975, Richard Griffin and Clarence Hart were arrested, charged with possession of small quantities of marijuana or derivative. Respondent fixed bail in each case at $5,000 to be supplied by a surety bond. In accordance with usual practice, an attorney for defendants, after inquiring from the Police Department as to the nature of the charges, called the Hudson County Bail Unit to request a reduction of bail. He related to the person in charge that Griffin was 37 years old, married with four children, the owner of property in Jersey City, employed by the Post Office and had no previous criminal record; and that Hart had once been arrested as a juvenile but had no adult record. This information and the reduction request were telephoned

at 10 P.M. to Hudson County Judge Richard F. Connors, who was working at his home preparing a charge to a jury. Judge Connors ordered reduction of the bail to $2,500 or ten percent ($250) cash bail. Respondent refused to accept this decision, stormed to the Central Booking Unit, refused to speak to Judge Connors on the telephone and blocked the posting of the reduced bail long enough for defendants to be detained in jail overnight. Described as distraught and screaming, he told Sergeant Bennett (in charge of the Central Booking Unit) to "tell the son-of-a-b" (Judge Connors) to come to Central Booking and "do things proper." Respondent asserted that accused would get out on bail "over his dead body" and that he did not give "a good goddamn about Larner" (Hudson County Assignment Judge Samuel A. Larner, having a supervisory administrative authority over the municipal courts).

The statutory panel concluded, and we agree, that:

> The statements made by respondent concerning Judge Larner and Judge Connors were unreasonable. His actions and conduct in the face of a bail reduction ordered by higher authority and known by him to have been so ordered were unworthy of one who holds judicial office. He was unable to accept the decision of higher authority in the judicial system and engaged in an unseemly dispute over the order made by such higher authority.

This dreary recitation need not be continued. The Attorney General's brief identifies manifold abuses of the judicial process by respondent (irregularity in proceedings; deprivation of defendants' constitutional rights; discourtesy to counsel; disparagement of defendants; abuse of contempt power; arbitrary bail; insubordination; injudicious attitudes) and the evidence contained in the record amply portrays the shambles into which justice was thus reduced in this respondent's courtroom. So it was that a parade of alleged miscreants, some poor, some undefended, some sick, some unstable and bewildered (and some, no doubt guilty), passed through an American courtroom with but scant atten-

tion being paid to rights possessed by them under Constitution and the common law.[4]

As mentioned by Chief Justice Weintraub in *In re Mattera, supra,* 34 *N. J.* at 274: "Justice is the right of all men and the private property of none. The judge holds this common right in trust, to administer it with an even hand in accordance with law."

■ Respondent seems unable to understand the relationship between justice and the defendant. The poorest, weakest, most hapless or illiterate defendant, standing before an American court, is entitled to exactly the same respect, rights and hearing as would be the Chief Justice of the United States standing before the court and similarly accused. This is part of what our Constitution means by "equal protection of the laws."

An intoxication with judicial power which would ignore basic constitutional precepts is a wholly unacceptable syndrome that cannot be tolerated in New Jersey courts. To brook it in a single courtroom would not only degrade the courts in general, but would affront the vast majority of municipal judges who perceive their courtrooms as "place[s] of justice," rather than arenas for exhibitionism by display, before an intimidated audience, of naked and illegal judicial power.

This is not to say that judicial response to crime, and particularly violent crime, should be excessively lenient. Our Court has urged administratively just the opposite for protection of the community, which is wholly consistent with observance of Constitution and law.

Nor should a judge ever forfeit control of his courtroom. But he should maintain it as a *judge* and not by unseemly, unjudicial and illegal suppression of individual rights. This

---

[4] "[N]o threats, nothing that has happened, nothing that can happen, will weigh a feather against allowing the defendant, upon this and every other question * * * the whole advantage he is entitled to from substantial law and justice * * *." Lord Chief Justice Mansfield in *Rex v. Wilkes,* 98 *Eng. Rep.* 327, 347 (K. B. 1770).

despite the convenient weapons of bailiff, "contempt," penitentiary or jail, or bail abuse, as well as the lure of supposed public applause in which as we have seen the respondent seems to be interested.

It has been argued for respondent that the number of cases in which his conduct has been found wanting is but a minute percentage of the thousands of cases he has handled without complaint from anyone and that he is entitled to be judged on the totality of his conduct, not the selected instances presented by the Advisory Committee alone. Assuming the dubious proposition that respondent's conduct has been free from fault in all the cases not explored by the record before us, the instances of misconduct and incompetence found in the record before us are amply sufficient, in themselves, to justify the adjudication here made.

Upon all of the evidence presented we find respondent totally unsuited, by temper and temperament, for judicial office. We find by his continuous abuse of the judicial process that he is guilty of misconduct in office, of conduct evidencing unfitness for judicial office, and that he is incompetent to be a judge. For such causes, the existence of which we find on the evidence beyond a reasonable doubt, he is hereby removed from office.

So ordered.

*For removal from office*—Chief Justice HUGHES, Justices MOUNTAIN, SULLIVAN, PASHMAN and CLIFFORD and Judge CONFORD—6.

*Opposed*—None.

## ORDER

A complaint and order to show cause why JUDGE JOHN W. YENGO should not be removed from judicial office having been issued pursuant to *R.* 2:14 and *N. J. S. A.* 2A–1B, *et seq.*, and this Court having determined that cause for removal exists beyond a reasonable doubt;

It is hereby ORDERED that, pursuant to *N. J. S. A.* 2A:1B–9, said JUDGE JOHN W. YENGO be removed from the office of judge of the municipal court of the City of Jersey City, effective immediately.