IN THE MATTER OF ROBERT C. THOMSON, JR., FORMER JUDGE OF THE MUNICIPAL COURT OF WESTFIELD, UNION COUNTY.

Argued June 6, 1985—Decided July 19, 1985.

---

*Patrick J. Monahan, Jr.,* Acting Secretary, argued the cause for complainant Advisory Committee on Judicial Conduct.

*Kenneth J. Grispin* argued the cause for respondent (*Leib, Kraus & Grispin,* attorneys).

PER CURIAM.

This proceeding arises out of the trial and conviction in Westfield Municipal Court of Jeffrey B. Darby. Shortly after Darby's trial, presided over by respondent, former Municipal Court Judge Robert C. Thomson,[1] Darby hanged himself in the Westfield jail. The incident was brought to the attention of the Supreme Court Advisory Committee on Judicial Conduct (Committee) by the publicity regarding Mr. Darby's suicide. Following a preliminary investigation, the Committee issued a formal complaint charging Judge Thomson with violations of Canons 1, 2A, and 3A(1), (2) and (4) of the Code of Judicial Conduct (Code).

After respondent filed an answer, the Committee held a formal hearing at which respondent appeared with counsel and

---

[1] On December 31, 1984 respondent voluntarily sought not to be reappointed as Municipal Court Judge of the Township of Westfield.

testified. As a result of these proceedings, the Committee issued a presentment recommending that respondent be publicly reprimanded for having violated Canon 1 (a judge should uphold the integrity of the judiciary); 2A (a judge should respect and comply with the law and conduct himself in a manner that promotes public confidence in the integrity and impartiality of the judiciary); 3A(1) (a judge should be faithful to the law and maintain professional competency in it and be unswayed by public clamor); 3A(2) (a judge should maintain order and decorum in proceedings before him); and 3A(4) (a judge should accord to every person who is legally interested in the proceeding the full right to be heard· according to law). One member of the Committee recommended that a private letter of reprimand be issued to respondent.

Pursuant to Rule 2:15–13, respondent moved before this Court for an order rejecting the Committee's recommendation. We issued an order to show cause why he should not be publicly reprimanded or otherwise disciplined. Based on our independent review of the record, we are convinced that while respondent's judgment in handling the *Darby* case was substantially flawed, his actions did not constitute judicial misconduct. Accordingly, we dismiss the presentment of the Committee.

I

Respondent was admitted to practice law in New York in 1937 and in New Jersey in 1947. At the time of his retirement on December 31, 1984, he had served as the municipal judge for the Township of Westfield for nine years. Prior to his appointment, he had served on the Westfield Juvenile Conference Committee, chairing that body for approximately twelve years. Until this unfortunate incident, respondent had an unblemished professional record, both as a judicial officer and as a practicing attorney.

This proceeding arises out of respondent's handling of the trial of *State v. Jeffrey B. Darby.* On December 15, 1983, respondent presided at the trial of Darby, who·was charged with shoplifting cigarettes from a supermarket and with possession of stolen property (54 cans of tuna) from a Quick Chek store. Darby appeared at the trial pursuant to a bench warrant, issued because of his failure to appear on a previously scheduled date.

Typically, the more serious matters before the Westfield Municipal Court were heard on Tuesdays, and a municipal prosecutor and public defender were routinely present. Neither was customarily present on Thursday sessions, a day usually reserved for minor matters. December 15, 1983, the date *State v. Darby* came before the court, was a Thursday, and neither the municipal prosecutor nor the public defender was present.

Since the case was set for Thursday, respondent assumed it was a minor matter. It was respondent's practice not to prejudice a prior offender by reviewing his criminal record before a hearing. If respondent had known of Darby's extensive criminal record, he would have adjourned the case until a Tuesday so that the municipal prosecutor and public defender would be present. To compound the confusion on the 15th, the regular court clerk was on vacation and the deputy court clerk, who attends court only five or six times a year, acted as clerk during this hearing.

Respondent opened the court session on that day with the following remarks addressed to all persons in the courtroom:

The Municipal Court of Westfield desires that you receive a full and fair hearing. In order to do so you should be aware of the following facts: You are presumed to be innocent until proven guilty beyond a reasonable doubt; you have the right to be represented by an attorney selected by you and retained at your own expense. If you want to be represented by an attorney and do not have one when your case is called you can request a reasonable adjournment for the purpose of obtaining legal counsel. You do not have to testify or make any statement, you may remain silent and any statement made by you may be

used against you. On the other hand you have a right to testify in your own defense and to call witnesses to support your defense.

You have a right to plead guilty or not guilty to any charge against you except an indictable offense. You have a right to appeal if you are not satisfied with the judgment of this Court.

Respondent stated that a more complete explanation of these rights was contained in a pamphlet prepared by the Administrative Office of the Courts, which was posted outside of the Violations Bureau. He did not distribute copies of the pamphlet to people in the courtroom. After these opening remarks, respondent explained the procedures that would be followed in the court. Unbeknownst to the respondent, it appears that defendant was not in the courtroom when he made his opening remarks.

When Darby's case was called, Darby approached the witnesses' microphone in an extremely agitated condition. Before respondent had an opportunity to read and explain the charge to him, and before Darby was sworn as a witness, he immediately blurted out:

MR. DARBY: Before we get started I have something to say. I got a problem.

THE COURT: Well, sit down and I'll listen. Wait a—Put the microphone in front of him.

MR. DARBY: I got charged with, you know, shoplifting, stealing some cigarettes.

THE COURT: You say that what?

MR. DARBY: Charge[d] with shoplifting, for stealing three carton[s] of cigarettes.

THE COURT: Yes.

MR. DARBY: And I'm guilty so I plead guilty to it. I missed one court date....

Immediately after Darby pled guilty to the shoplifting charge, he accused the police of beating him, and engaged in an argument about this with Detective Gray, the investigating officer from the Westfield Police Department. Darby then stated that he had an alcohol problem and was presently in an alcohol program for thirty days and thereafter was to go into another program in Philadelphia for six to nine months. No proof with respect to Darby's participation in these programs

was offered by him. Darby later testified he also had a drug problem.

Respondent accepted Darby's plea of guilty to the shoplifting charge. At that time respondent did not know that this was Darby's third offense, which mandated a custodial sentence if Darby were convicted. At the hearing, it was construed as a second offense.

Respondent then considered the second charge against Darby, possessing stolen property. Darby denied that the 54 cans of tuna with Quick Chek labels on them were stolen. He claimed that he purchased them from someone on Market Street in Newark. This claim was immediately disputed by Detective Gray, who advised the court that he had contacted a representative from Quick Chek who confirmed that cans of tuna were missing from a Quick Chek store. Detective Gray's testimony, like that of the defendant, was unsworn.

Thereafter, James Rustiano, Quick Chek's loss prevention representative, was sworn by the deputy court clerk and testified that cans of tuna bearing the same serial number as those found in Darby's possession were located in a number of Quick Chek's stores. He could not specifically state that the cans were from the Piscataway store where the theft allegedly took place, but assumed they were since that store reported a lower than normal amount of tuna fish on its shelves. After this testimony, Darby was given the opportunity to question both Detective Gray and James Rustiano. However, Darby directed most of his questions and comments to respondent.

During this exchange between respondent and Darby, respondent explained to Darby that he was not being charged with shoplifting the tuna but with possession of stolen property. Darby then changed his pled to guilty. After the testimony, respondent recessed to review defendant's record for the first time. His record disclosed numerous convictions, including one for an indictable offense for which he was to be sentenced in Somerville the next day.

Respondent found defendant guilty of both charges. With respect to the shoplifting charge, respondent fined Darby $250 and ordered him to pay $25 in court costs and $25 to the Violent Crimes Compensation Board. With respect to the possession conviction, respondent assessed the same costs and compensation payment and also sentenced the defendant to a 30-day jail term.

Immediately after he was sentenced, the defendant asked whether the jail term could be suspended if he paid the respective fines and costs. The reason he gave for this request was his impending admission into an alcohol rehabilitation program, followed by participation in a drug detoxification program in Philadelphia. No proof of Darby's participation in any rehabilitation program was ever presented to the respondent. Based on respondent's experience he considered it extremely unlikely someone would be released from a program to attend a hearing without some direct communication from the program personnel to the Court. Respondent denied the request of Darby, who was led, shouting, directly to the Westfield jail.

After the Darby hearing, respondent handled two brief matters. He then spoke to the woman who had accompanied Darby and advised her that he felt Darby needed help. The woman concurred. Respondent told her that he would see what he could do to help Darby and that she should so advise him. She then went to the jail to speak to Darby.

Respondent proceeded to his chambers in the municipal building in order to telephone the probation department and alert them of Darby's problem. While doing so, respondent noticed emergency vehicles approaching the municipal building. Darby, who had been led to the jail approximately two hours earlier, had hanged himself in his cell.

At the request of a prisoners' rights group, prior to Darby's confinement, the surveillance cameras in the jail had been disconnected, a fact of which respondent was not aware. Darby's suicide was widely reported in the press and prompted the

Public Advocate to conduct an investigation, which concluded that there had been no criminal misconduct connected with the incident.

## II

The Committee's charge that respondent engaged in unethical conduct is based solely on his handling of the *Darby* proceeding. The Committee found that the defects that plagued the trial constituted more than mere technical noncompliance with court and administrative rules and rose to the level of a disciplinary violation. Specifically, the Committee focused on the following infractions:

1. Respondent's failure to advise Darby individually of his constitutional right to counsel and right to have counsel appointed if he were indigent.[2]

2. Respondent's failure to swear in as a witness either defendant or Detective Gray.

3. Most significantly, respondent's failure to inform Darby of the reasons for his sentence, as required by Rule 3:21–4(e) and Rule 7:4–6(c).

In reaching its conclusion, the Committee relies on *In re Yengo*, 72 *N.J.* 425 (1977). We find that *Yengo* has little relevance to this case. In *Yengo* the municipal judge repeatedly abused his power, evidenced disrespect for the law, and committed "manifold abuses of the judicial process" (e.g., irregularity in proceedings, deprivation of defendants' constitutional rights, discourtesy to counsel, disparagement of defendants, abuse of contempt power, arbitrary bail, insubordination and in-

---

[2]Although the Committee correctly reports that the *New Jersey Municipal Court Manual,* January, 1983, requires that each defendant be individually advised of his rights, the recent *Report of the Supreme Court Task Force on the Improvement of Municipal Courts,* 1985 Judicial Conference, makes it clear that many municipal courts do not follow that procedure but instead, particularly in minor matters, read a general statement of a defendant's rights at the beginning of the session, as respondent did here.

judicious attitudes). *Id.* at 449. Yengo was a judge intoxicated by judicial power who ignored "basic constitutional precepts in a wholly unacceptable syndrome that cannot be tolerated in New Jersey courts." *Id.* at 450.

In contrast, the conduct that is under consideration here represents a single incident in respondent's long, untainted career. No pattern of misconduct exists. Further, a review of the transcript of the *Darby* hearing discloses that respondent was neither intemperate nor abusive in his handling of Darby. Nor did respondent's conduct constitute injudicious courtroom behavior involving offensive language. Darby was permitted to talk at will and was interrupted only when his conduct became so uncontrollable as to be disruptive to the proceeding. Respondent displayed neither arrogance nor intoxication with his judicial power.

Nevertheless, the respondent admits that the procedure followed in the *Darby* trial did not conform to his usual practice. He admits that he did not individually advise Darby of his right to counsel; that he did not swear in as a witness either Darby or Detective Gray; and that he did not explain to Darby the reasons for his sentence. Respondent claims the reason for his failure to follow his usual procedures was due not to any improper motivation, but arose strictly from the extraordinary circumstances of this case.

From beginning to end this case was an aberration. Respondent testified that in his eight years on the bench he had never faced such an unusual situation. Respondent never had a defendant reach his chair, and in a state of great agitation, loudly blurt out the charge against him, plead guilty, and insist on giving the details. He had never before been faced with a defendant who appeared to be so disturbed. Darby was virtually uncontrollable as he appeared before respondent, standing up and moving about, often requiring respondent to direct him to be seated so that his statements could be recorded. Faced with this thoroughly unique situation, respondent simply failed to

swear in Darby and Detective Gray. He thought it best to allow Darby to speak his piece.[3] As the hearing proceeded, respondent became concerned that Darby might represent a danger to himself and others if he were released. Respondent explains his position as follows:

> In view of his very strange conduct, his testimony that he had both a drug and an alcohol problem, his desire to get into a program, and his failure to appear, I was convinced that he needed help at an institution. I knew that Marlboro would not take a drug problem, and I did not know where to send him. I considered adjourning the case for a presentence report, and after it was received to list the case for a rehearing with the prosecutor and defender present. However, his conduct was so strange and his inability to control himself was so serious that I became convinced that it was not safe to release him, since he might do serious injury to himself and other citizens, until his condition was reviewed by a professional. The only place I knew where help could be obtained was through the Probation Department. On account of his condition in the court room, I had to do something with him until we could get him the help which he indicated he needed and I was convinced he did. Having determined it was unsafe to release him until he was seen by a professional, I sentenced him to jail for 30 days, which could be amended to an appropriate rehabilitation program. His condition was such that I could not then talk to him about my future plans for him.

In recalling the details of that proceeding, respondent admits, "Frankly I did not know what to do." There were, and still are, no guidelines in existence for the type of situation in which respondent found himself.[4]

Respondent testified that he never intended to keep Darby in jail. Due to Darby's extraordinary behavior, respondent determined early in the proceeding that a probation referral would be made and the case returned during a Tuesday session when

---

[3] If the regular court clerk had been present, it is possible that she would have advised him that Darby was not in the courtroom when respondent made his general statement on defendants' rights, a fact of which respondent was unaware. But to add to the irregularities of this proceeding, the deputy court clerk, who was seldom in court, was acting as clerk that day.

[4] Undoubtedly, respondent's lack of proper support personnel and his unfamiliarity with the proper agencies to which he could refer Darby played a role in this unfortunate incident. These are general problems that face many municipal courts and are currently being studied by the Supreme Court Task Force on the Improvement of Municipal Courts.

counsel was present. He ordered a jail sentence solely to keep Darby in custody while he obtained help for him.

### III

The Committee expressed skepticism that respondent sentenced Darby to jail solely to protect him. Nevertheless, it did not find there was clear and convincing evidence to establish that respondent had not done so, and furthermore expressed no doubt that respondent had acted in good faith. Our independent review of the record leads us to agree with these findings. Since Darby had to be arrested to ensure his appearance in court, and in light of his peculiar behavior, respondent felt that if he did not place Darby in custodial care, Darby would not return to court when instructed to do so. He thought that while in jail Darby would be safe from harm. Unfortunately, and tragically, respondent was wrong. With the best of intentions, he chose the wrong solution. Although undoubtedly there were better options, respondent exercised his best judgment under the unique circumstances that suddenly and unexpectedly confronted him. With the benefit of hindsight it is clear that respondent exercised poor judicial judgment and did not handle the situation well. However, his actions did not constitute unethical conduct.

The ultimate answers to the questions of whether a judge is guilty of misconduct, and if so, what discipline is appropriate, are based on a judgment that turns on the particular circumstances of each case. Not every failure of a judge to conform to the standards of the Code amounts to judicial misconduct. *In re Alvino*, 100 *N.J.* 92 (1985). While judges are held to the very highest standards of performance in this State, they are not infallible and occasionally will exercise errors of judgment.

Moreover, the rulings made by respondent that are in question were appealable by Darby. While a judge who makes an incorrect ruling with respect to a defendant's constitutional rights may be reversed on appeal, he is normally not, nor

should he be, subject to charges of judicial misconduct. By definition, an incorrect ruling does not automatically constitute judicial misconduct. Nevertheless, this proceeding should serve to remind judges that their role is circumscribed by the Constitution. Despite the best of motives a judge cannot try to decide what is best for a defendant, as distinct from what he knows is constitutionally required. To do so is to depart from his or her role as a judge.

In conclusion, we recognize that respondent's transgression was serious. But we also recognize the unique circumstances present in this case, the difficult position in which respondent found himself, the time pressure under which respondent was required to act, and that this matter represents a single unfortunate incident in respondent's long and otherwise unblemished professional record.

Accordingly, we dismiss the Committee's presentment.

*For dismissal* —Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Opposed* —None.