SYLLABUS

(This syllabus is not part of the opinion of the Court.  It has been prepared by the Office of the Clerk for the convenience of the reader.  It has been neither reviewed nor approved by the Supreme Court.  Please note that, in the interest of brevity, portions of any opinion may not have been summarized.)

**In the Matter of Louis M.J. DiLeo (D-66-12) (072095)**

**Argued April 30, 2013 -- Decided January 27, 2014**

.
**PER CURIAM**

This judicial disciplinary matter came before the Court on a Presentment from the Supreme Court Advisory Committee on Judicial Conduct (Committee).  The Committee reviewed the matter under Rule 2:15-8(a) and concluded that respondent, former Municipal Court Judge Louis M.J. DiLeo (Judge DiLeo or respondent), violated several Canons of the Code of Judicial Conduct: Canon 1 (a judge should observe high standards of conduct so the integrity and independence of the judiciary may be preserved), Canon 2A (a judge should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary), and Canon 3A(1) (a judge should be faithful to the law and maintain professional competence in it).  The Committee recommended that respondent be reprimanded.  The Court issued an Order to Show Cause why respondent should not be publicly disciplined.

On October 4, 2009, Anthony Kirkland and Wendell Kirkland (the defendants, Kirkland defendants, or Anthony and Wendell)  were arrested in Linden.  The defendants were charged with unlawful taking of five lug nuts, attempted theft by unlawful taking of a tire, possession of burglary tools, and possession of fifty grams or less of marijuana.  The charges were downgraded to disorderly persons offenses and referred to the Linden Municipal Court where respondent was a part-time municipal court judge.  Judge DiLeo arraigned the defendants on April 12, 2010.  The defendants indicated that they wished to proceed with private counsel.  Judge DiLeo gave the defendants until May 3, 2010, to retain counsel, and told them that by electing to retain private counsel they had waived their right to the appointment of a public defender.

On the conference date of May 3, each defendant appeared pro se.  Although Anthony's statement was reported as inaudible on the transcript, Wendell clearly asked to have a public defender appointed.  Judge DiLeo told the defendants that they had previously "waived the public defender" and scheduled the matter for trial on May 12.  Judge DiLeo conducted the trial in the absence of both defense counsel and the municipal prosecutor.  Judge DiLeo conducted direct examination of the arresting officer, permitted each Kirkland brother to cross-examine the officer, and then permitted the defendants an opportunity to present witnesses in their defense.  Although both defendants had witnesses they wished to present, none were present in the courtroom that evening.  Respondent then advised the Kirkland defendants of their Fifth Amendment right against self-incrimination and provided each an opportunity to testify in his own defense.  Afterward, the arresting officer was invited to and did cross-examine each defendant.  Judge DiLeo also questioned Anthony at length about his conduct on the evening of his arrest and then questioned the arresting officer again about the events of the evening.

At the conclusion of the trial, which lasted less than one hour, Judge DiLeo stated that he had "heard all the testimony" and that "[i]t does not sound credible, either of the tales that were told by Wendell Kirkland and Anthony Kirkland."  Judge DiLeo found the defendants guilty of all charges and pronounced sentences that included jail, consecutive probationary terms, fines, and costs.  Anthony and Wendell were immediately taken into custody.  The defendants appealed.  The Law Division appointed counsel for each.  Judge Scott Moynihan presided over a de novo Law Division proceeding, at which the State informed the court that it "agree[d] that the procedures used in municipal court violated the defendants' due process rights."  The State further requested that the convictions be "vacated and the matter remanded, perhaps to a different municipal court."  On March 4, 2011, Judge Moynihan held that the municipal trial violated the defendants' constitutional rights and that both the trial and the sentencing of the defendants were improper.  The court concluded that Judge DiLeo had "transformed the role of the court from a neutral and detached magistrate and evoked the specter of the backwater 'judge, jury and executioner' figure that has never had any place in American jurisprudence."  The court found the defendants not guilty on the possession of marijuana charge and remanded the remaining charges to the Elizabeth Municipal Court for a new trial.

1

On February 3, 2011, Michael P. Rubas, Esq., who had represented Wendell in the de novo appeal before the Law Division, filed a complaint with the Advisory Committee regarding Judge DiLeo's handling of the defendants' trial. The Mayor of Linden also filed a grievance. The Committee conducted an investigation and questioned Judge DiLeo via letter dated April 15, 2011. In a response, Judge DiLeo addressed the complaints by emphasizing generally the enormity of the municipal court's docket at the time. He explained that he was not attempting to prosecute the case, but rather was trying to move the court's calendar along.

On December 12, 2012, the Committee conducted a formal hearing and on January 16, 2013, issued the Presentment that is before this Court. The Committee noted that the case presented an "issue of first impression in New Jersey, namely under what circumstances may a judge's legal error constitute grounds for a finding of judicial misconduct." Quoting In re Benoit, 487 A. 2d 1158, 1163 (Me. 1985), the Committee adopted an objective standard: whether a "'reasonably prudent and competent judge' considers the conduct 'obviously and seriously wrong in all circumstances.'" Applying that standard, the Committee concluded that Judge DiLeo "abdicated his judicial function and assumed the role of the prosecutor" and "complete[ly] contravened … the court rules and established case law," warranting that he be reprimanded.

On January 30, 2013, Judge DiLeo filed with this Court a motion to dismiss and/or to modify the Presentment. On March 11, 2013, the Court issued an Order to Show Cause requiring the judge "to show cause why public discipline, less than removal, but including permanent disqualification, should not be imposed."

**HELD:** The undisputed facts clearly and convincingly demonstrate that former Judge Louis M.J. DiLeo committed egregious legal errors in conducting the proceedings involving Anthony Kirkland and Wendell Kirkland. Judge DiLeo's conduct violated Canons 1, 2A, and 3A(1) of the Code of Judicial Conduct. Respondent is reprimanded.

1. Every judge is duty bound to abide by and enforce the standards in the Code of Judicial Conduct. There are two determinations to be made in connection with the imposition of judicial discipline: (1) has a violation of the Code been proven by clear and convincing evidence, and (2) does that violation amount to unethical behavior warranting discipline. Generally, discipline is warranted "'when conduct is marked with moral turpitude and thus reveals a shortage in integrity and character.'" Id. at 102. The Court also has acknowledged that a single violation of the Code that was "willful" or "typical of the judge's work" may constitute judicial misconduct. (pp. 19-21)

2. Legal error has provided the foundational basis in this state for charging judges with violations of Canons 1, 2A, and 3A(1) of the Code of Judicial Conduct. A case-by-case approach has been used when analyzing charges of legal error to discern judicial misconduct under these canons. Where willful abuse of judicial power or inability to follow the law has been found, demonstrating judicial misconduct in the extreme, the Court has not hesitated to impose the harshest of sanctions and has removed a sitting jurist on the basis of incompetence and unfitness for judicial office. The overriding concern is the capacity of judicial behavior, objectively viewed, to undermine public confidence in the integrity and impartiality of the judicial process. (pp. 22-27)

3. The appropriate standard – most consistent with Rule 2:15-8(a), the Code, and the Court's general approach to judicial discipline – is the objective "reasonably prudent and competent judge" standard of Benoit with a "plus," as a majority of jurisdictions require. To be subject to judicial discipline under the Code, there must be clear and convincing proof of objective legal error under the test described in Benoit, that the error must be "made contrary to clear and determined law about which there is no confusion or question as to its interpretation," and that the error must be "egregious, made in bad faith, or made as part of a pattern or practice of legal error." This standard protects judicial independence and preserves public confidence in the judiciary. (pp. 27-35)

4. The undisputed facts clearly and convincingly demonstrate that Judge DiLeo committed egregious legal errors in his conduct of the proceedings involving the Kirkland defendants. Respondent's manner of conducting this trial deprived the defendants of their fundamental due process rights and eliminated all indicia of impartiality by the judge -- and fact-finder -- in this bench trial. The egregiousness of these errors had the clear capacity to undermine public confidence in the dignity, integrity, and impartiality of the judicial system of this state. Judge DiLeo violated Canons 1, 2A, and 3A(1) of the Code of Judicial Conduct. He committed legal errors of the degree and kind that call into question judicial competence and cast a pall over the judiciary as a whole, and that constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute. R. 2:15-8. (pp. 36-42)

Former Municipal Court Judge Louis M.J. DiLeo is **REPRIMANDED**.

**CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in the Court's opinion.**

IN THE MATTER OF

LOUIS M.J. DILEO

A FORMER JUDGE OF

THE MUNICIPAL COURT

       Argued April 30, 2013 - Decided January 27, 2014

       On an Order to show cause why respondent
       should not be publicly disciplined through
       the imposition of an appropriate sanction
       that does not include removal from judicial
       office.

       Tracie H. Gelbstein, Designated Presenter,
       argued the cause on behalf of the Advisory
       Committee on Judicial Conduct.

       Anthony B. Vignuolo argued the cause for
       respondent (Borrus, Goldin, Foley, Vignuolo,
       Hyman & Stahl, attorneys.

    PER CURIAM

    The Advisory Committee on Judicial Conduct (Committee) issued a Presentment against Louis M.J. DiLeo, a former municipal court judge in Linden, charging him with judicial misconduct under the Code of Judicial Conduct (the Code) and Rule 2:15-8(a). The Committee recommended that the judge be reprimanded for legal errors of an egregious nature committed

1

when presiding over the municipal trial of Anthony Kirkland and Wendell Kirkland (the defendants, Kirkland brothers, or Anthony and Wendell) on disorderly persons offenses.  The trial errors that lie at the heart of this matter were reversed on appeal by the Law Division, which found that Judge DiLeo deprived the defendants of their right to representation by counsel, conducted the trial without the municipal prosecutor, required the arresting officer to represent the State by questioning the defendants, and himself acted as the prosecutor by personally questioning witnesses.

Although legal error is not typically grounds for discipline, legal error that is egregious, made in bad faith, or part of a pattern or practice of legal error has the capacity to detrimentally affect public confidence in the judicial process. Indeed, either a pattern of incompetent or willful legal error or a sufficiently egregious instance of such error can undermine public confidence in the judiciary.  The overriding concern when considering alleged judicial misconduct of any form is the capacity of the judicial conduct, objectively viewed, to undermine public confidence in the integrity, impartiality, and independence of the judicial system.  That concern must drive the determination of whether legal error rises to the level of misconduct under the Code and requires the imposition of discipline.

This matter presents the opportunity for this Court to address the standard by which legal error in a judge's performance must be assessed to determine if the error constitutes judicial misconduct subject to discipline.

## I.

## A.

The Committee's Presentment reviewed the facts and the procedural history of the underlying proceeding that precipitated the charges against Judge DiLeo. These facts were not contested and find their support in the record of the municipal court proceedings in issue.

On October 4, 2009, the Kirkland brothers and a third defendant were arrested in Linden. The Kirkland brothers were charged in summonses with unlawful taking of five lug nuts, attempted theft by unlawful taking of a tire to which the lug nuts were attached, possession of burglary tools (e.g., a hydraulic floor jack and a lug wrench), and possession of fifty grams or less of marijuana, which was found in a vehicle that the three defendants used to travel to the location of the incident that led to their arrest. After reviewing the charges, the Union County Prosecutor's Office downgraded the indictable offenses to disorderly persons offenses and referred them to the Linden Municipal Court on February 4, 2010. At that time, Judge

3

DiLeo was a part-time Linden municipal court judge, having held that position for approximately seven years.

Judge DiLeo arraigned the defendants on April 12, 2010. At the arraignment, after advising the defendants of the charges against them and of the possible consequences each faced if convicted, Judge DiLeo reviewed with the defendants their rights, including their right to an attorney and to the appointment of a public defender if they were indigent. Anthony and Wendell indicated that they wished to proceed with an attorney and that they wished to retain private counsel.[1] Judge DiLeo gave the defendants until May 3, 2010, to retain counsel and told them that by electing to retain private counsel they had waived their right to the appointment of a public defender.

On the conference date of May 3 when the defendants were to provide written proof of having secured counsel, each defendant appeared pro se. Although Anthony's response was reported as inaudible on the transcript, Wendell clearly asked to have a public defender appointed. Instead, Judge DiLeo told the defendants that they had "waived the public defender" when they previously requested to be represented through private counsel. Wendell immediately asked, "A private attorney now?" to which Judge DiLeo told him "You had a private – you had the chance

_____

[1] The third defendant, Jesus Gonzalez, took public defender representation and pled guilty prior to the Kirkland brothers' trial.

4

from April 12th to get a private attorney sir.  I'm going to schedule this case up for Tuesday May 11th."  Judge DiLeo in fact scheduled the matter for trial on May 12, exactly one month after arraigning the defendants on the disorderly persons charges.  He presided over the trial, which began at 9:13 p.m. and concluded at 10:05 p.m.

Having determined that the Kirkland defendants had "waived the public defender," Judge DiLeo conducted the trial in the absence of defense counsel.  In addition, he permitted the trial to proceed that evening in the absence of the municipal prosecutor.  The record contains no indication that the judge made any effort to attempt to locate the municipal prosecutor prior to proceeding with the trial.  As a consequence, the only individuals to participate in the trial were Judge DiLeo, the arresting police officer, and the Kirkland defendants.  Judge DiLeo conducted direct examination of the arresting officer and then permitted each Kirkland brother to cross-examine the officer.  At the conclusion of the officer's testimony, Judge DiLeo asked the officer if he had any "other witnesses" to "produce" or evidence to present, to which the officer responded, "[T]here's no evidence here."  The judge asked the officer if he intended to "rest" his case to which the officer responded, "Yes."

5

Judge DiLeo then permitted the defendants an opportunity to present witnesses in their defense. Although both defendants had witnesses they wished to present, none were present in the courtroom that evening. We note that Jesus Gonzalez, the third defendant involved in the incident underlying the charges and an important witness for the defendants, had been present in the courtroom earlier that evening.

With no witnesses available for the defense, the judge advised the Kirkland defendants of their Fifth Amendment right against self-incrimination and provided each an opportunity to testify in his own defense. Afterward, the arresting officer was invited to and did cross-examine each defendant. At the conclusion of the arresting officer's cross-examination, Judge DiLeo also questioned Anthony Kirkland at length about his conduct on the evening of his arrest and then questioned the arresting officer again about the events of the evening.

At the conclusion of this trial, Judge DiLeo stated that he had "heard all the testimony" and that "[i]t does not sound credible, either of the tales that were told by Wendell Kirkland and Anthony Kirkland." He explained that he had "observed their demeanor throughout the testimony" and concluded that "I don't – I don't find their testimony convincing and I don't find it believable." Much of the judge's reasoning for finding the defendants' testimony incredible was based on information that

6

the judge had elicited from the defendants through his questioning.

After finding the defendants guilty of all charges, Judge DiLeo sentenced Wendell to 180 days in county jail, "day for day," three consecutive one-year probationary terms, and fines totaling $2700 exclusive of penalties and costs. Judge DiLeo sentenced Anthony to two "day for day" consecutive 180 day jail terms and three consecutive one-year probationary terms. The judge also imposed the maximum fines permitted for each offense, totaling $3100 exclusive of penalties and costs.

Anthony and Wendell Kirkland were taken into custody immediately and served 124 days for the disorderly persons offenses.

The defendants appealed their convictions to the Law Division of the Superior Court. The Law Division determined the defendants to be indigent and appointed counsel for each.

Judge Scott Moynihan presided over a de novo Law Division proceeding, at which the State informed the court that it "agree[d] that the procedures used in municipal court violated the defendants' due process rights." The State further requested that the convictions be "vacated and the matter remanded, perhaps to a different municipal court." On March 4, 2011, the court held that the municipal trial conducted by Judge DiLeo had violated the defendants' constitutional rights. The

court concluded that both the trial and the sentencing of the defendants were improper.

In respect of the trial, the court found that the defendants had not knowingly and voluntarily waived their Sixth Amendment constitutional right to counsel and, moreover, that Judge DiLeo had not engaged "in the colloquy required before a defendant is allowed to represent himself." The court also found that the defendants' due process rights were violated when Judge DiLeo questioned the arresting officer and Anthony, pointedly cross-examining the witnesses and using the testimony elicited from Anthony to find him incredible when fashioning his findings. According to the court, Judge DiLeo improperly acted as the prosecutor for the municipality. The court added that it was improper to allow the arresting officer to cross-examine the defendants, noting that no authority permits a "non-attorney to participate in a trial as the State's sole representative, especially when no attorney is present and engaged in the proceedings." The court concluded that Judge DiLeo's actions had removed all impartiality and neutrality from the proceedings, stating that the judge had "transformed the role of the court from a neutral and detached magistrate and evoked the specter of the backwater 'judge, jury and executioner' figure that has never had any place in American jurisprudence."

8

With regard to the defendants' sentencing, the court found several errors. It determined that Judge DiLeo did not set forth on the record his findings on aggravating and mitigating factors as required, that he improperly imposed consecutive sentences without providing the basis for such action, that he improperly imposed periods of parole ineligibility in a case where the sanction was not authorized by law, that he improperly imposed a jail term in excess of ninety days as a condition of probation in violation of law, and that he failed to consider the defendants' eligibility for release on parole when sentencing as required by N.J.S.A. 2C:44-1(c)(2). The court further noted that Judge DiLeo imposed maximum fines without ascertaining the defendants' ability to pay, failed to permit Anthony to allocute before sentencing in violation of Rule 7:9-1(a), and failed to advise the defendants of their right to appeal.

The court then found the defendants not guilty on the possession of marijuana charge and remanded the remaining charges to the Elizabeth Municipal Court for a new trial. On remand, the defendants each pled guilty to a downgraded charge of breach of the peace, an ordinance violation.

B.

On February 3, 2011, Michael P. Rubas, Esq., who had represented Wendell in the de novo appeal before the Law

Division, filed a complaint with the Committee regarding Judge DiLeo's handling of the defendants' trial. Richard Gerbounka, the Mayor of Linden, also filed a grievance with the Committee on the same subject.

In New Jersey, judges are subject to discipline as provided by Court Rules and the Code of Judicial Conduct. The Committee is tasked by this Court with reviewing all allegations of:

> (1) misconduct in office,
> (2) willful failure to perform judicial duties,
> (3) incompetence,
> . . . .
> or
> (6) conduct prejudicial to the administration of justice that brings the judicial office into disrepute.
>
> [R. 2:15-8(a).]

Based on its investigation, the Committee can take a number of actions. It may determine that, even though the judicial conduct does not merit public discipline, the conduct nevertheless may constitute

> conduct of the type set forth in Rule 2:15-8(a) or other conduct that would reflect unfavorably on the judicial office if it were to become habitual or more substantial in character, [and therefore the Committee may]
>
> (1) communicate to the judge its private censure, reprimand, admonition, caution, or guidance concerning the conduct in question.
>
> [R. 2:15-10(c).]

10

The Committee may also

> determine[] after a formal hearing that the charges against the judge have been proved by clear and convincing evidence and that a recommendation should be made to the Supreme Court for public reprimand, censure, suspension, or removal.

> [R. 2:15-15(a).]

In this matter, the Committee conducted an investigation in which it considered the proceedings conducted by Judge DiLeo and the appeal to the Law Division.[2]  The Committee also considered the following material.  The Committee questioned Judge DiLeo initially via a letter dated April 15, 2011.  In a response dated August 11, 2011, Judge DiLeo addressed the complaints filed by Rubas and Gerbounka by emphasizing generally the enormity of the municipal court's docket at the time.  He asserted that the Linden Municipal Court's docket was overwhelming and that the number of court sessions was insufficient to allow him to address all the cases on his docket.  He explained that the docket issue had been rectified since the trial involving the Kirkland brothers due to an increase in the number of sessions and by the passage of a resolution that allowed for additional judges, prosecutors, and public defenders.

---

[2] We rely largely on the Presentment in summarizing this disciplinary matter's history before the Committee.

11

In respect of the specific trial of the Kirkland brothers, Judge DiLeo stated that he believed that the defendants had waived their right to a public defender and that the defendants' request on May 3, 2010, for counsel was a stall tactic. Judge DiLeo added that the defendants' case was an "old case" and that he believed further delay would have raised speedy-trial concerns. Thus, he explained that he was not attempting to prosecute the case, but rather, was trying to move the court's calendar along.

Judge DiLeo acknowledged the Law Division's de novo decision in that matter, adding that he would ensure the errors found by the Law Division would not recur. He also stated his belief that the grievance filed by Mr. Rubas constituted an attempt to gain an advantage in an anticipated civil suit against him by the Kirkland brothers; however, he denied having any bias against the defendants and asserted that when he was conducting the defendants' trial he had been concerned about increased theft in Linden.

On October 24, 2011, the Committee issued a formal complaint against the judge. The complaint alleged that Judge DiLeo violated Canons 1, 2A, and 3A(1) of the Code of Judicial Conduct by denying the Kirkland brothers due process and their constitutional right to counsel and by committing multiple procedural errors during sentencing.

12

C.

On December 12, 2012, the Committee conducted a formal hearing on the complaint issued against Judge DiLeo. Judge DiLeo was the only witness in the proceeding.

Judge DiLeo attacked the accuracy of the Law Division judge's decision, although he stated that he had not read it. Judge DiLeo also asserted that the then municipal prosecutor had developed a practice of leaving court without the judge's knowledge and permission and, thus, the prosecutor would waive his opportunity to be present and place the burden on the arresting officer to proceed with the matter. Judge DiLeo again pointed to the age of the case and the need to move his calendar forward as justifying his decision to proceed without a prosecutor present. He also argued that the Law Division judge had not received transcripts of all proceedings when conducting his de novo review; specifically Judge DiLeo asserted that the Law Division did not receive transcripts of the defendants' appearances prior to the trial date. As a result, he claimed that the Law Division judge was misled about the defendants' waiver of counsel, leading to the incorrect conclusion that Judge DiLeo had not advised the Kirkland brothers of their right to counsel.

Judge DiLeo maintained that he attempted to be fair to both sides, which was why he permitted the arresting officer to

13

cross-examine the defendants and why he questioned both the officer and the defendants. Judge DiLeo surmised that the State did not review the entire record before recommending the matter be vacated and remanded. Finally, he conceded that his use of the word "consecutive" when sentencing the defendants was a mistake, but one of exhaustion that should have been caught and corrected by his staff.

D.

On January 16, 2013, the Committee issued the Presentment that is before this Court. The Committee concluded in the Presentment that, "with the exception of [Judge DiLeo's] procedural errors when sentencing the Kirkland defendants, these violations have been proved by clear and convincing evidence and, consequently, [Judge DiLeo] is subject to discipline."

The Committee noted that the case presented an "issue of first impression in New Jersey, namely under what circumstances may a judge's legal error constitute grounds for a finding of judicial misconduct." The Committee added that, generally, legal error is not grounds for judicial misconduct, and that neither case law nor our Canons have "delineated a standard by which to determine when reversible legal error constitutes misconduct under Canon 3A(1) specifically or Canons 1 and 2A generally." The Committee looked to case law outside of New Jersey and, quoting In re Benoit, 487 A.2d 1158, 1163 (Me.

14

1985), adopted an objective standard: whether a "'reasonably prudent and competent judge' considers the conduct 'obviously and seriously wrong in all circumstances.'" Citing In re Quirk, 705 So. 2d 172, 178 (La. 1997), the Committee added that an egregious legal error is an "exception to the general rule that legal error is not subject to judicial discipline," and that "[error] involving the denial of basic fundamental rights[] may constitute judicial misconduct."

Applying that standard, the Committee concluded that Judge DiLeo "abdicated his judicial function and assumed the role of the prosecutor" and "complete[ly] contravened . . . the court rules and established case law." Moreover, it found that the conduct constituted a "perversion of justice for which judicial discipline is required." Thus, "a reasonably prudent and competent judge would consider [Judge DiLeo's] conduct in the Kirkland matter obviously and seriously wrong in all circumstances," and Judge DiLeo's conduct was in violation of the Code of Judicial Conduct. Specifically, Judge DiLeo's conduct was criticized because he did not conduct the matter in a manner that would maintain public confidence in the judiciary. As examples, the Committee concluded that he became an advocate for the State, which denied the defendants due process, and he deprived the defendants of their constitutional right to counsel absent a knowing and voluntary waiver of that right. According

15

to the Committee, Judge DiLeo essentially forced the defendants to proceed on a pro se basis, failing to ensure that the process by which the defendants ended up without representation was fair. The Committee also stated that a backlogged court docket is not "justification for . . . absolute disregard of appropriate procedures and the fundamental rights of defendants, especially when, as here, the defendants faced a consequence of magnitude."

In determining the proper discipline to be imposed, the Committee balanced aggravating and mitigating factors. It found four aggravating factors: (1) the extent to which the misconduct demonstrates a lack of judgment and integrity; (2) a serious undermining of the public confidence and integrity in the judicial process and system; (3) harm inflicted on defendants (time spent in jail after denial of rights); and (4) harm to the judicial process generally. The Committee noted these were the first misconduct complaints filed against Judge DiLeo, but the incident included "several breaches of proper conduct," "was significant," and was "deserving of discipline." As a single mitigating factor, the Committee found that Judge DiLeo had taken steps necessary to ensure that the conduct would not be repeated. The Committee recommended that Judge DiLeo be reprimanded as the proper measure of discipline.

On January 30, 2013, Judge DiLeo filed with this Court a motion to dismiss and/or to modify the Presentment. He argues that the Committee erred in recommending that he be subjected to discipline because this was a matter of first impression and the Committee should not have applied retroactively a new standard for judicial misconduct to him. On March 11, 2013, we issued an Order to Show Cause requiring the judge "to show cause why public discipline, less than removal, but including permanent disqualification, should not be imposed."

II.

A.

In his argument to this Court, Judge DiLeo maintains that the reasonably prudent judge standard adopted by the Committee is unworkable because every procedural or constitutional error reversed on appeal may expose judges to claims of judicial misconduct. He argues that trial judges should be free to make independent decisions without fear of discipline. He maintains that the standard developed by the Committee may improperly elevate "obvious" or "serious" legal errors to misconduct that would be subject to disciplinary sanction.

Judge DiLeo urges instead that we adopt a standard similar to one adopted by California in Oberholzer v. Commission on Judicial Performance, 975 P.2d 663, 680 (Cal. 1999), which would "require[] a finding of bad faith, bias, abuse of authority[,]

17

and intentional disregard of the law." Applying that standard in this matter, Judge DiLeo argues that nothing in the record suggests that his conduct was motivated by bad faith or bias, and that his conduct was not an abuse of authority. Accordingly, he contends that his legal errors should not be elevated to judicial misconduct.

Furthermore, Judge DiLeo argues that the standard adopted by the Committee should not apply retroactively. Essentially, he contends that the Committee issued a new rule of law and that, were this Court to accept the standard recommended by the Committee, he should not be disciplined because he had no prior guidance that legally erroneous conduct was subject to sanction.

B.

The Committee urges this Court to adopt the reasonably prudent and competent judge standard as the most apt in judicial discipline involving the review of charges of serious legal error by a judge. It argues that the provisions of the Code of Judicial Conduct should be broadly construed and applied, with judicial performance considered from the perspective of a reasonably prudent and competent judge. The Committee asserts that Judge DiLeo's errors were egregious violations of Canons 1, 2A, and 3A(1) for which public discipline is crucial in order to restore honor, integrity, and public confidence in the judiciary.

18

The Committee also maintains that, because Judge DiLeo's misconduct is rooted in Canons 1, 2A, and 3A(1), its pronouncement of a standard for discipline is not a new rule of law. Thus, the Committee argues that disciplining Judge DiLeo under well-established standards is fair and proper, and that this Court fairly can apply the reasonably competent and prudent judge standard in this case.

III.

A.

Every judge is duty bound to abide by and enforce the standards in the Code of Judicial Conduct. See R. 1:18. The Code "is a general statement of standards and goals, admirably serving the purpose of providing guidance to judges in all matters precisely because of the generality of its provisions." In re Alvino, 100 N.J. 92, 102 (1985). While judges are expected to adhere to the Code, every breach "does not mean, however, that judicial misconduct has occurred, or that discipline . . . is appropriate." Id. at 96.

We have recognized that there are two determinations to be made in connection with the imposition of judicial discipline: (1) has a violation of the Code been proven by clear and convincing evidence, see R. 2:15-15(a); In re Perskie, 207 N.J. 275, 289 (2011); and (2) does that violation amount to unethical behavior warranting discipline, see In re Thomson, 100 N.J. 108,

19

118 (1985); Alvino, supra, 100 N.J. at 102-03. The salutary aspect to that approach has been shown in past decisions where we have recognized that a judge's behavior violated a Canon's standard but that it did not warrant a determination that judicial misconduct had occurred, or that discipline was appropriate. See, e.g., Thomson, supra, 100 N.J. at 110; Alvino, supra, 100 N.J. at 97.

> It was never intended that each and every failure to conform to the standards of the Code would lead to judicial discipline. Some shortcomings were undoubtedly contemplated as inevitable, and, assuming good motives, they were not thought to provide cause for either criticism or discipline. . . . There is a difference between achieving high standards and perfection. The former may fall short of the latter, but it is no cause for discipline.

> [Alvino, supra, 100 N.J. at 96-97.]

On the other hand, there are other "standards, goals, and requirements of the Code whose violation, no matter how atypical, and no matter how 'minor,' will call not only for discipline, but for the harshest discipline." Id. at 97. Dishonesty is in the latter category, but by no means is there a definitive list. Ibid.

Generally, discipline is warranted "'when conduct is marked with moral turpitude and thus reveals a shortage in integrity and character.'" Id. at 102 (quoting In re Mattera, 34 N.J.

20

259, 270 (1961)); accord In re Mathesius, 188 N.J. 496, 524 (2006).  We also have acknowledged that a single violation of the Code that was "willful" or "typical of the judge's work" may constitute judicial misconduct.  See Alvino, supra, 100 N.J. at 97 n.2.  That said, a case-by-case approach has been a hallmark of the judicial discipline system in view of the general nature of the Code and its standards, taking into account that "'[t]he single overriding rationale behind our system of judicial discipline is the preservation of public confidence in the integrity and the independence of the judiciary.'"  In re Subryan, 187 N.J. 139, 153 (2006) (quoting In re Seaman, 133 N.J. 67, 96-97 (1993)).

In sum, the judicial disciplinary system operates for the primary purpose of restoring and maintaining public confidence in our system of delivering justice, in recognition of the importance of the public's respect for the men and women who daily dispense justice in their courtrooms.  As we have stated in the past when considering alleged breaches of the Code of Judicial Conduct, "once the Court decides that there has been a breach of judicial ethics, its goal is not so much to punish the offending judge as to restore and maintain the dignity and honor of the position and to protect the public from future excesses."  Ibid. (internal quotation marks omitted).

B.

Three Canons of the Code are relevant in this matter. Each addresses a judge's conduct and its relationship, in all respects, to the maintenance of public confidence in the dignity, impartiality, integrity, and independence of the judiciary:

> [Canon] 1.   A Judge Should Uphold the Integrity and Independence of the Judiciary
>
> An independent and honorable judiciary is indispensable to justice in our society. A judge should participate in establishing, maintaining, and enforcing, and should personally observe, high standards of conduct so that the integrity and independence of the judiciary may be preserved. The provisions of this Code should be construed and applied to further that objective.
>
> [Canon] 2.   A Judge Should Avoid Impropriety and the Appearance of Impropriety in All Activities
>
> A. A judge should respect and comply with the law and should act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> . . . .
>
> [Canon] 3.   A Judge Should Perform the Duties of Judicial Office Impartially and Diligently
>
> The judicial duties of a judge take precedence over all other activities. Judicial duties include all duties of the office prescribed by law.   In the

22

> performance of these duties, the following standards apply:

> A. Adjudicative Responsibilities.

> (1) A judge should be faithful to the law and maintain a professional competence in it. A judge should be unswayed by partisan interest, public clamor, or fear of criticism.

> [Pressler & Verniero, Current N.J. Court Rules, Appendix to Part I at 481-82 (2013).]

Those Canons were cited in the Presentment against Judge DiLeo based on the legal error identified by the Law Division in its de novo review of the Kirkland brothers' convictions and by the Committee when it reviewed the judge's handling of the proceedings involving the Kirkland brothers.

Legal error has provided the foundational basis in this state for charging judges with violations of Canons 1, 2A, and 3A(1) of the Code before. A case-by-case approach has been used when analyzing charges of legal error to discern judicial misconduct under the above-cited Canons. In two cases, a violation of the Code was found to have occurred, but the Court concluded that, because the erroneous legal conduct was either an aberration due to unique circumstances or constituted a technical deviation from the Code's requirements, it did not amount to unethical conduct warranting discipline. See Thomson, supra, 100 N.J. at 118 (finding judge's incorrect judicial action with respect to agitated and uncontrollable defendant

23

serious but attributable to extraordinarily unique circumstances); Alvino, supra, 100 N.J. at 96-101 (holding that inadvertent and atypical delay in disposing of two matters warranted administrative correction, not judicial discipline and, separately, that it would be unjust to discipline judge for his longstanding but erroneous administrative reporting of "reserved" cases that never before had been corrected). In both cases, the Court found that the judge was not willful, but rather, had acted in good faith when committing the error in judicial performance. See Thomson, supra, 100 N.J. at 118; Alvino, supra, 100 N.J. at 101.

On the other hand, where willful abuse of judicial power or inability to follow the law has been found, demonstrating judicial misconduct in the extreme, this Court has not hesitated to impose the harshest of sanctions and has removed a sitting jurist on the basis of incompetence and unfitness for judicial office. See In re Yengo, 72 N.J. 425, 451 (1977) (removing judge from office based on multiple instances of abuse of judicial process constituting misconduct and unfitness).

Other than the case-by-case approach used by this Court in those few cases in the past, the Committee noted in its Presentment a lack of a pronounced standard to guide its review of charges of judicial misconduct based on legal error. Acknowledging that judicial independence provides "the very

24

foundation of our legal system and is recognized in Canon 1," the Committee nevertheless correctly perceived that a standard was necessary, citing Quirk, supra, 705 So. 2d at 178, and McBryde v. Committee to Review Circuit Council Conduct, 264 F.3d 52, 65 (D.C. Cir. 2001), for the accepted principle that judicial independence is not intended to shield "from discipline those judges whose disregard for the law in their legal rulings detrimentally affects the public's regard of the judiciary."

Consideration of the public's perception of the judiciary is not new to the judicial discipline process. It lies at the core of the Code of Judicial Conduct. See Subryan, supra, 187 N.J. at 153 (noting overriding concern about public's positive perception of judiciary's integrity and repute). Canon 3A(1) of the Code requires a judge to "be faithful to the law and maintain professional competence in it." Further, Canon 1 compels a judge to maintain high standards of conduct that preserve the integrity and independence of the Judiciary, and Canon 2A, through its Commentary, exhorts a judge to avoid "all impropriety and appearance of impropriety and [to] expect to be the subject of constant public scrutiny." Malperformance of judicial duties that has the capacity to shake public confidence in the integrity or impartiality of the judiciary can breach those Canons and be the subject of discipline. As we instructed in In re Blackman, 124 N.J. 547, 554 (1991), the "rules

25

governing judicial conduct are broadly construed, in keeping with their purpose of maintaining public confidence in the judicial system." It bears noting that other courts have disciplined judges for disregard of the law that has a detrimental effect on public perception of the integrity and impartiality of the Judiciary. See, e.g., Miss. Comm'n on Judicial Performance v. Wells, 794 So. 2d 1030 (Miss. 2001) (reprimanding judge for basing conviction on affidavits alone); Miss. Comm'n on Judicial Performance v. Byers, 757 So. 2d 961, 973 (Miss. 2000) (reprimanding and fining judge for misconduct that included sentencing defendant under wrong statute and failing to correct that error); In re Scott, 386 N.E.2d 218, 220-21 (Mass. 1979) (publicly reprimanding judge and imposing one-year hiatus for course of conduct that resulted in violation of constitutional rights).

In sum, although we have repeatedly expressed the view that mere legal error "normally" does not and should not subject a judge to charges of judicial misconduct, Thomson, supra, 100 N.J. at 118-19; see also In re Mattera, 34 N.J. 259, 270-71 (1961) (noting that disciplinary power "ordinarily" not for mere judicial error but reserved for conduct "marked with moral turpitude" revealing "shortage in integrity and character"), the overriding concern is the capacity of judicial behavior, objectively viewed, to undermine public confidence in the

26

judicial system.  Judicial conduct, including conduct in the form of legal error, that has the capacity to undermine public confidence in the integrity and impartiality of the judicial process can be the basis for charges of judicial misconduct and can lead to the imposition of discipline.

With that background in mind, we turn to the question of the standard to be applied when reviewing legal error that is alleged to amount to judicial misconduct meriting discipline.

IV.

A.

1.

The Committee found persuasive the approach taken in the State of Maine, which rejected as unsatisfactory a case-by-case approach for assessing legal error in the disciplinary context. The Supreme Judicial Court of Maine in Benoit, supra, adopted the objective "reasonably prudent and competent judge" standard for use in judicial disciplinary matters.  487 A.2d at 1162-63. In rejecting a case-by-case approach, the Maine Court explained that this approach fails to assure the public that "judges are being held to a defined and definable level of conduct," does not serve to strengthen the internal integrity of the disciplinary process because it lacks a definite standard by which to judge misconduct, and "fails to indicate to judges the particular level of scrutiny that will be applied to their

27

behavior, should it ever be challenged." <u>Id.</u> at 1163. The Maine Court noted that

> every trial judge will from time to time commit legal errors in decisions later reversed on appeal, but judicial discipline would be in order in almost none of those cases. Something more than a mere error of law is required to constitute misconduct under Canon 3A(1).
>
> [<u>Ibid.</u>]

The standard adopted by the Maine Court reflected that assessment and provided that a judge should not be sanctioned for a legal error "that a reasonable judge would not have considered obviously wrong in the circumstances or . . . [that] is <u>de</u> <u>minimus</u>." <u>Ibid.</u>

A similar standard pertains in Oklahoma. <u>See</u> <u>State ex rel. Edmondson v. Colclazier</u>, 106 <u>P.</u>3d 138, 143 (Okla. Ct. Jud. App. Div. 2002) (recognizing that "line must be drawn between mere legal error correctable by appeal and acts which are obviously and seriously wrong and amount to excessive use of judicial authority," and noting further that factors to be considered include "the availability of appeal, the nature of the judge's conduct, the extent of the court's jurisdiction, the motive of the judge, the egregiousness of the error, and the frequency of the offending conduct").

Our research reveals a number of different approaches taken in our sister jurisdictions in respect of judicial discipline

28

based on allegations of serious legal error. The <u>Benoit</u> approach of applying an objective reasonableness test for judicial conduct is one. We consider also the tests developed in other jurisdictions.

2.

Several other jurisdictions accept that legal error may constitute grounds for judicial misconduct but look for "legal error plus," with variations abounding as to what has been found to constitute the "plus" that must accompany the demonstration of legal error.

At least one state requires that the legal error be willful or made in bad faith for discipline to be imposed. <u>See</u> <u>In re Sheffield</u>, 465 <u>So.</u> 2d 350, 358-59 (Ala. 1984) (declining to discipline judge where improper use of contempt power was not done in bad faith). Other states employ different variations. <u>See, e.g.,</u> <u>Ark. Judicial Discipline & Disability Comm'n v. Simes</u>, 381 <u>S.W.</u>3d 764, 770-71 (Ark. 2011) (requiring for disciplinary purposes that legal error involve fraud, corrupt motive, or bad faith, and that bad faith be demonstrated by "knowledge that the act was beyond his lawful judicial power" or taken in "conscious disregard for the limits of his authority").

Our research reveals that California and Rhode Island employ a similar standard for what constitutes the requisite "plus." <u>Compare</u> <u>Oberholzer</u>, <u>supra</u>, 975 <u>P.</u>2d at 680-81 (stating

29

that "[m]ere legal error, without more, . . . is insufficient to support a finding that a judge has violated the Code of Judicial Ethics and thus should be disciplined"; rather, legal error must also "clearly and convincingly reflect[] bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty"), with In re Comm'n on Judicial Tenure & Discipline, 916 A.2d 746, 754-55 (R.I. 2007) (applying test similar to California's but using the Benoit "reasonable judge" underlying standard: "errors of law may constitute ethical misconduct when the error clearly and convincingly reflects bad faith, bias, abuse of authority, disregard for fundamental rights, intentional disregard of the law, or any purpose other than the faithful discharge of judicial duty" and "in determining whether a judge has engaged in judicial misconduct, courts [must] apply a reasonableness test[, namely, whether] a reasonably prudent and competent judge would consider that conduct obviously and seriously wrong in all the circumstances" (internal quotation marks and citations omitted)).

Louisiana, Kentucky, Alaska, and Texas use similar terms to describe what constitutes the requisite "plus" for their judicial discipline purposes. See In re Boothe, 110 So. 3d 1002, 1019 (La. 2013) (reaffirming prior decision in Quirk,

30

supra, 705 So. 2d 172, and stating that judge may be disciplined when the "legal ruling or action [was] made contrary to clear and determined law about which there is no confusion or question as to its interpretation and where this legal error was egregious, made in bad faith, or made as part of a pattern or practice of legal error" (emphasis added)); Alred v. Commonwealth, 395 S.W.3d 417, 436 (Ky. 2012) (holding that to impose sanctions, judge must have "acted in bad faith, engaged in a pattern of misconduct," or the errors must have been egregious -- "the judge's legal ruling or action [must have been] made contrary to clear and determined law about which there is no confusion or question as to its interpretation" (internal quotation marks omitted)); In re Curda, 49 P.3d 255, 260-61 (Alaska 2002) (holding that "legal error that is neither willful nor part of a repeated pattern of misconduct is not an appropriate subject for discipline"); In re Barr, 13 S.W.3d 525, 545 (Tex. 1998) (stating legal error constitutes misconduct when "a legal ruling or action [is] made contrary to clear and determined law about which there is no confusion or question as to its interpretation and where the complained-of legal error is egregious, made as part of a pattern or practice of legal error, or made in bad faith" (emphasis added)), reh'g denied, 13 S.W.3d at 562 (Tex. Rev. Trib. 1999).

Finally, we note the existence of a third category of jurisdictions that appear to utilize a case-by-case approach to determine when a judge's legal error renders the judge subject to judicial discipline. See, e.g., In re Stigler, 607 N.W.2d 699, 710 (Iowa 2000) ("[L]egal error becomes serious enough to warrant discipline when judges deny individuals their basic or fundamental procedural rights."); Disciplinary Counsel v. Squire, 876 N.E.2d 933, 939, 952 (Ohio 2007) (finding procedural errors and pattern of inappropriate judicial conduct rose to level requiring sanctions).

## B.

When the Committee applied the reasonably prudent and competent judge standard in this matter, our Court had recognized that legal error can be grounds for judicial discipline under the Code but had applied a case-by-case approach in the few cases that had involved such charges. We had not articulated a guiding standard for assessing when legal error constitutes judicial misconduct.

We are benefitted by the Committee's thoughtful consideration of the need for a standard and for its sound recommendation that an objective standard be adopted. As was noted in Benoit, supra, the public needs to know that "judges are being held to a defined and definable level of conduct," and

judges must know the "particular level of scrutiny that will be applied to their behavior, should it ever be challenged." 487 A.2d at 1163. Of equal importance, an objective standard enhances the disciplinary system by "strengthen[ing] the internal integrity of the disciplinary process." Ibid.

Our review of the subject leads us to conclude that, on balance, the appropriate standard -- most consistent with our Rule 2:15-8(a), our Code, and our general approach to judicial discipline -- is the objective "reasonably prudent and competent judge" standard of Benoit with a "plus," as a majority of jurisdictions require.[3] To be subject to judicial discipline under the Code, we hold that there must be clear and convincing proof of objective legal error under the test described in Benoit, that the error must be "made contrary to clear and determined law about which there is no confusion or question as to its interpretation," and that the error must be "egregious, made in bad faith, or made as part of a pattern or practice of legal error." Boothe, supra, 110 So. 3d at 1019. So characterized, the "plus" requirement will sift through charges

---

[3] The "plus" requirement ensures that not every legal error, even if clear and unmistakable to a competent jurist, constitutes a violation of the Code, which necessarily leads to a determination of whether the judge should be sanctioned. We thus adhere to the approach taken in Alvino, and in a majority of other jurisdictions, and require that a violation of the Code, in the form of legal error, first must be determined to constitute misconduct under Rule 2:15-8(a).

of legal error and focus on whether the violation of law that allegedly transgresses the Code's expectations of judges constitutes "incompetence," "conduct prejudicial to the administration of justice that brings the judicial office into disrepute," or "willful failure to perform judicial duties." See R. 2:15-8(a).

Although the examples of egregious conduct, bad faith, or a pattern of legal error are not intended to be all encompassing, the standard as articulated should provide sufficient guidance overall as to the "plus" that must be shown for legal error to amount to unethical conduct and thus be subject to discipline. This standard shields from disciplinary action legal error that is reversible on appeal where the law had not been clear prior to the judge's determination or where the judge engaged in a simple abuse of authority or mistake of law. On the other hand, if the error in following the law were willful, it could fall into either the egregious or bad faith categories, particularly if it impacted fundamental rights clearly and unmistakably known to every competent jurist such that their violation brings the judicial process into public disrepute.

We are constrained to recognize that either a pattern of incompetent or willful legal error or a sufficiently egregious instance of such legal error has the capacity to undermine public confidence in the integrity and independence of the

34

judiciary, and can constitute a violation of the Code that necessitates judicial discipline or removal from office. Indeed, this Court is empowered to institute removal proceedings against a sitting judge for, among other reasons, incompetence. See N.J.S.A. 2B:2A-2, -3; see, e.g., Yengo, supra, 72 N.J. 425. That said, it should be rare for a judge to be subjected to the disciplinary process for an erroneous application of law. The disciplinary process should be reserved for the type of legal error that, singly, if egregious enough, or in a pattern or practice of legal error, has the capacity, objectively viewed, to undermine the public's perception of and impugn the integrity and impartiality of the judicial process as a whole.

By acknowledging that egregious or bad faith conduct can be susceptible to judicial discipline, even if it occurs on a single occasion, the standard we adopt is aligned with the prior warning in Alvino, supra, where the Court suggested that a single violation of the Code that was "willful" or "typical of the judge's work" may constitute judicial misconduct. 100 N.J. at 97 n.2. Thus, as a result of establishing a high bar for legal error to constitute judicial misconduct, yet one that is capable of being reached by a sufficiently egregious set of facts, the standard adopted protects judicial independence and preserves public confidence in the judiciary. See Subryan, supra, 187 N.J. at 153.

35

Turning to the application of that standard to the matter at hand, we first note that Judge DiLeo does not dispute the uncontested facts on which the Committee relied to conclude that he engaged in misconduct worthy of public discipline. Those uncontested facts are largely taken from the municipal court proceedings involving the Kirkland brothers.

The undisputed facts clearly and convincingly demonstrate that Judge DiLeo committed egregious legal errors in his conduct of the proceedings involving the Kirkland brothers. The Committee on Judicial Conduct, and the Law Division in its de novo review of the Kirkland brothers' convictions, both also concluded as much. Each expressed that the obvious -- indeed outrageous -- errors committed by the judge denied the Kirkland brothers not only their constitutional right to have the publicly appointed counsel they had requested, but also their right to due process of law.

In our de novo review of the record as presented, we find that, contrary to Judge DiLeo's assertion, neither defendant "waived" his right to a public defender. The defendants had expressed a desire to retain private counsel. However, when they returned before Judge DiLeo on May 3, 2010, as directed, they did not have private counsel assisting them. Judge DiLeo never explored the reasons why the defendants did not secure the

services of private counsel.  The defendants asked on that day for the appointment of a public defender and were denied that request on the basis that it had been "waived."  However, our case law clearly requires a searching inquiry by the court before the right to counsel can be knowingly and voluntarily relinquished.  See State v. DuBois, 189 N.J. 454, 468 (2007).  As was noted by the Law Division when reviewing these proceedings, "[t]he fact that [the defendants] tried to secure private counsel . . . does not amount to a knowing, voluntary waiver of their right to have a lawyer represent them in a trial that resulted in county jail sentences for each defendant."

Objectively viewed, Judge DiLeo egregiously mishandled the routine and regular task of appointing public defenders to represent indigent defendants.  His conduct forced the defendants to go to trial pro se, which, as the Law Division noted, placed the defendants at "an obvious disadvantage."  "The importance of counsel in an accusatorial system such as ours is well recognized."  Rodriguez v. Rosenblatt, 58 N.J. 281, 295 (1971) (noting also that "[i]f the matter has any complexities the untrained defendant is in no position to defend himself and, even where there are no complexities, his lack of legal representation may place him at a disadvantage").

The Law Division catalogued well the disadvantages that the deprivation of the right to counsel visited on defendants.  The

37

court's description bears repeating: These two pro se defendants (1) "did not know enough to object to the hearsay testimony offered by the arresting officer" regarding the on-scene identifications made by the victims who were brought to the location where the defendants were arrested; (2) "were not in a position to explore the viability of a motion to suppress evidence of a warrantless search or to suppress the identifications made at the arrest location"; (3) "did not know to make a motion to dismiss the marijuana charge because a lab report was never even mentioned much less entered into evidence [and because] the officer [never] testif[ied] that he had training and/or experience in the identification of narcotics"; (4) "did not know how to try to secure the testimony of Jesus Gonzalez"; and (5) "did not know how to investigate Anthony's claim that Gonzalez told the arresting officer that the marijuana was his." Those disadvantages were serious as was the magnitude of their consequences. As we have made abundantly plain as a basic precept of municipal court practice,

> as a matter of simple justice, no indigent defendant should be subjected to a conviction entailing imprisonment in fact or other consequence of magnitude without first having had due and fair opportunity to have counsel assigned without cost.
>
> [Rodriguez, supra, 58 N.J. at 295.]

38

Moreover, it also is abundantly clear that Judge DiLeo's manner of conducting this trial deprived the defendants of their fundamental due process rights. The judge himself took on the role of prosecutor in this matter by pointedly questioning witnesses and, ultimately, using evidence that he secured through his cross-examination of the defendants to convict them. His conduct eliminated all indicia of impartiality by the judge -- and fact-finder -- in this bench trial. See Ridgewood v. Sreel Inv. Corp., 28 N.J. 121, 132 (1958) (stating that "[t]here is a point at which the judge may cross that fine line that separates advocacy from impartiality" and noting that questioning of a witness that crosses this line may cause "substantial prejudice to the rights of one of the litigants"); see also State v. Taffaro, 195 N.J. 442, 450-51 (2008) (cautioning trial courts to use "great restraint in questioning witnesses," particularly in jury trials, while noting that N.J.R.E. 614 and case law allow judges to question witnesses in order "to clarify their testimony" or "to help elicit facts" "when a witness is in severe distress"). Moreover, compounding his injudicious actions in this matter, Judge DiLeo allowed a non-attorney -- the arresting officer -- to participate as the State's sole representative in the trial. See R. 7:8-7(b) (authorizing municipal prosecutor, municipal attorney, Attorney General, county prosecutor, county counsel, or, in limited

39

instances, a private attorney, to represent State in municipal court prosecutions); State v. Hishmeh, 266 N.J. Super. 162, 166 (App. Div. 1993) (disallowing police officer's questioning of witness in absence of municipal prosecutor based on prior version of Rule 7:8-7(b)); see also R. 1:21-1(a) (prohibiting non-attorneys from practice of law in this state).

So, in effect, the defendants had the judge and the testifying police officer who had arrested them as their adversaries in their trial. These errors were "contrary to clear and determined law about which there is no confusion or question." Boothe, supra, 110 So. 3d at 1019. That the defendants were pro se facilitated this miscarriage of justice, for we expect that no attorney would have stood silent in the face of such flagrant and obvious error in the basic delivery of justice in a courtroom in New Jersey.

In sum, the conscious decisions of Judge DiLeo resulted in a perversion of the judicial process. This record is replete with legal error involving fundamental rights and basic court procedures that any competent jurist would recognize to be wrong. It cannot be defended or minimized. We specifically reject, as the Committee did, the judge's "reliance on a heavy court docket as justification for his absolute disregard of appropriate procedures and the fundamental rights of defendants, especially when, as here, the defendants faced a consequence of

magnitude." A court's concern about judicial "backlog" never trumps protection of a defendant's constitutional rights.

Judge DiLeo conducted this trial on his own terms. He denied the defendants' request for counsel, forced them to go to trial pro se after refusing their request for a public defender, prosecuted the case with the help of the arresting police officer, personally cross-examined the defendants, and found the defendants guilty based on testimony that he himself had elicited during his cross-examination. Furthermore, at the conclusion of those proceedings, Judge DiLeo sent these two pro se defendants to jail where they remained for 124 days for non-violent disorderly persons offenses. Not only the defendants but also the judicial system were victims. The judge violated basic principles and procedures of our judicial system that people have a right to expect a municipal court to follow when prosecuting a citizen for a disorderly persons offense.

The legal errors that took place in the municipal court proceedings conducted by Judge DiLeo were egregious. The egregiousness of these errors -- indeed, the judicial misconduct that occurred here -- had the clear capacity to undermine public confidence in the dignity, integrity, and impartiality of the judicial system of this state. Judge DiLeo violated the Code of Judicial Conduct, specifically Canons 1, 2A, and 3A(1). He committed legal errors of the degree and kind that call into

41

question judicial competence and cast a pall over the judiciary as a whole, and that constitute conduct prejudicial to the administration of justice that brings the judicial office into disrepute.  R. 2:15-8.  We accept the Committee's weighing of aggravating and mitigating factors in this matter and conclude that a reprimand is the proper quantum of punishment.

Accordingly, for all the reasons expressed herein, we direct that Judge DiLeo be publicly reprimanded for his egregious legal error committed when presiding over the trial of the Kirkland brothers for disorderly persons offenses.

IT IS SO ORDERED.

CHIEF JUSTICE RABNER; JUSTICES LaVECCHIA, ALBIN, and PATTERSON; and JUDGES RODRÍGUEZ and CUFF (both temporarily assigned) join in the Court's opinion.

IN THE MATTER OF     :

LOUIS M. J. DiLEO,   :

A FORMER JUDGE OF    :

THE MUNICIPAL COURT :

        O R D E R

This matter having come before the Court on a presentment of the Advisory Committee on Judicial Conduct, and respondent having been ordered to show cause why he should not be publicly disciplined, and good cause appearing;

It is ORDERED that former Judge Louis M.J. DiLeo is hereby publicly reprimanded.

WITNESS, the Honorable Stuart Rabner, Chief Justice, at Trenton, this 27th day of January, 2014.

CLERK OF THE SUPREME COURT

SUPREME COURT OF NEW JERSEY

NO. __D-66__                                SEPTEMBER TERM 2012

APPLICATION FOR _____

DISPOSITION ___Order to Show Cause Why Respondent Should___

_____Not be Publicly Disciplined_____


IN THE MATTER OF

LOUIS M. J. DiLEO,

A FORMER JUDGE OF

THE MUNICIPAL COURT


DECIDED _____January 27, 2014_____

OPINION BY _____Per Curiam_____

CONCURRING OPINION BY _____

DISSENTING OPINION BY _____

| CHECKLIST | REPRIMAND | | |
|-----------|-----------|---|---|
| CHIEF JUSTICE RABNER | X | | |
| JUSTICE LaVECCHIA | X | | |
| JUSTICE ALBIN | X | | |
| JUSTICE PATTERSON | X | | |
| JUDGE RODRÍGUEZ (t/a) | X | | |
| JUDGE CUFF (t/a) | X | | |
| TOTALS | 6 | | |

2